**In re DANVILLE HOTEL CO., Inc.**

District Court, E. D. Illinois.   June 15, 1929.

No. 260–D.

Jones, McIntire & Jones, of Danville, Ill., and W. E. Norvell, Jr., of Nashville, Tenn., for mortgagees and Caldwell & Co.

Gunn, Penwell & Lindley, of Danville, Ill., for trustee.

Acton, Acton & Snyder, of Danville, Ill., and Dent, Dobyns & Freeman, of Chicago, Ill., for Charles Benson, Inc., and Ætna Casualty & Surety Co.

Clark & Hutton, of Danville, Ill., for Arthur A. Marer & Co.

R. R. Bookwalter, of Danville, Ill., for O. K. Yeager.

Acton, Acton & Snyder, of Danville, Ill., for Carson-Payson Co.

Good, Childs, Bobb & Wescott, of Chicago, Ill., for E. M. Weiner Co.

O. D. Mann, of Danville, Ill., for Clifford Shields.

Charles Troup, of Danville, Ill., for Danville Brick Co.

Lewman & Carter, of Danville, Ill., for Hartmann & Co.

Allen & Dalbey, of Danville, Ill., for Vermilion County Telephone Co.

LINDLEY, District Judge. After the adjudication in bankruptcy and election of a trustee herein, the latter filed his petition before the referee for a sale of all assets belonging to the bankrupt, consisting of a lot with hotel building and equipment thereon, free and clear of liens. On May 23, 1923, an order of the character prayed for was entered, after the trustees under the general deed of trust and numerous lien claimants had filed answers, with prayers for affirma-

tive relief, and various issues had been presented to the referee and were pending before him. This order directed the sale of the property free and clear of liens and transferred any and all liens to the proceeds of sale. The appraised value of the real estate was $843,536; that of the personal property $95,177.07. All of said property was sold for the sum of $622,500; $56,216.52 being the amount received for the personal property, and $566,283.48 for the real estate.

After the sale the referee proceeded to a hearing and adjudication of the various issues pending before him. The chief controversies related to the question of whether the original contractor and various subcontractors and materialmen were entitled to mechanics' liens, under the statute of the state of Illinois, as against the trustee in bankruptcy, hereinafter termed trustee, the trustees under the general mortgage, hereinafter termed mortgagees, and all other persons. The mortgagees claimed a prior lien by virtue of their real estate mortgage to the extent of $700,000 of par value of bonds. Various controversies were presented arising out of the questions of priorities between the alleged mechanic lienholders, the trustee, and the mortgagees. There was presented also a controversy between the trustee and Caldwell & Co. as to a fund, aggregating more than $63,000, which the trustee claimed belonged to the estate. Caldwell & Co., underwriters of the bond issue, had retained out of the proceeds thereof, over and above its contracted profit, the sum of $40,000, and in addition had paid out to mortgagees and others $23,000 from said proceeds, all of which the trustee claimed should be paid to the bankrupt estate. The vendor of the furniture and fixtures claimed a mechanic's lien upon the real estate, because of alleged addition to the improvement thereof. All of these controversies have been disposed of by the referee, and certificates of review have been filed as to certain matters thereof, which are hereinafter discussed separately.

#### The Claim of Liberty Central Trust Company and H. J. Miller, as Mortgagees.

The Liberty Central Trust Company and Miller as trustees, being also trustees under the real estate mortgage securing bonds, received from the bankrupt a chattel mortgage covering all furniture, furnishings, crockery, glass, silverware, carpets, utensils, screens, curtains, fixtures, window shades, vacuum cleaners, and all other chattels of every description on July 2, 1926, and recorded the same on the same date. The form of the mortgage complies with the Illinois statute. The evidence shows that the bankrupt, on that date, did not have or own any chattels whatsoever, and did not acquire any until after December 1, 1926. The mortgagees did not at any time take possession of any of the property described in said mortgage. The owner remained in possession of the same until bankruptcy, whereupon the trustee entered into possession. Thus the question is raised as to whether a mortgage upon chattel property, having no existence at the time of the execution of the mortgage, shall apply to after-acquired property as against a trustee in bankruptcy, who under the Bankruptcy Act occupies the position of a judgment creditor armed with an execution. The solution of this question depends upon the law of Illinois.

In Titus et al., Trustees, v. Mabee, 25 Ill. 232, a suit in equity, it was held that a chattel mortgage or deed of trust on chattels does not create a lien on personal property acquired after its execution as against creditors holding executions against the mortgagor, unless the mortgagee takes possession before the liens of the executions attach. That having been a suit in equity, the rule there recognized must be taken as the rule of law of Illinois in both equity cases and lawsuits. The rule apparently has not been modified. It was followed in Standard Brewery v. Nudelman, 70 Ill. App. 356, affirmed 172 Ill. 337, 50 N. E. 190; Schemerhorn v. Mitchell, 15 Ill. App. 418; Tennis v. Midkiff, 55 Ill. App. 642; Pinkstaff v. Cochran, 58 Ill. App. 72. The courts of Illinois have repeatedly held that a chattel mortgage covering all crops to be grown during a certain year on specified premises is void as to crops thereafter planted and grown, and that to make it effectual some new act of the mortgagor is necessary. Roy v. Goings, 6 Ill. App. 162, affirmed 96 Ill. 361, 36 Am. Rep. 151; Gittings v. Nelson, 86 Ill. 591; Stowell v. Blair, 5 Ill. App. 104. Other cases holding that a chattel mortgage is void as to subsequently acquired property as to judgment creditors are Hunt, Trustee, v. Bullock, 23 Ill. 258; Borden v. Croak, 33 Ill. App. 389, affirmed 131 Ill. 68, 22 N. E. 793, 19 Am. St. Rep. 23, and Palmer v. Forbes, 23 Ill. 237.

The United States Circuit Court of Appeals for the Seventh Circuit has previously considered this question and in the case of In re Mossler Co., 239 F. 262, at page 265, said: "It is clear that, until possession was taken, the lease, as a chattel mortgage or equitable lien, was without efficacy." The

court went on to say that in Illinois an express power to take possession of the property covered even by a fraudulent mortgage will protect the mortgagee who has actually seized the property. The language of the leading case in Illinois, Hunt v. Bullock, 23 Ill. 258, at page 264, is particularly pertinent. There the court said: "By its rules, all such efforts at a sale or mortgage are regarded as nothing more than a mere executory agreement for a sale, and for its breach," the law "gives compensation in damages, as for the nonperformance of any other executory contract. But, on the contrary, if such a mortgage is so far executed that the after-acquired property has passed into the hands of the mortgagee, under the original mortgage, it has been held to create an equitable lien which a court of chancery will recognize and enforce, *unless prior liens have attached*. Until possession is acquired by the mortgagee, the court will not afford relief, but will leave the party to his remedy at law, which is adequate and complete. If it was otherwise, it would be to decree a specific performance of an agreement for the sale of personal chattels, which the court will rarely do, as a matter of original jurisdiction. That cases may be found which hold that such agreements create an equitable lien on future acquired or created property, without reference to its having been reduced to possession, is no doubt true, but [they] seem to be opposed to the weight of authority, and in violation of the rules of equity jurisprudence. * * * To hold * * * that the principles of equity jurisprudence will uphold such instruments is to decide that what has been prohibited by statute, and what has been held by courts of law to constitute a fraud, is in equity legal, and has claims upon the chancellor to enforce it as equitable and just. Whatever may have been held in other states, in the absence of such a statute as ours, or such decisions as have been made in our courts of law, in this state, we feel wholly unauthorized to override the statutes and former decisions by assuming jurisdiction, and giving these instruments validity." The order of the referee denying validity to the chattel mortgage is affirmed and approved.

However, the mortgagees contend further that, if the chattel mortgage given them is invalid, the furnishings hereinafter mentioned, when installed, became accessions to the freehold, fixtures constituting a part of the real estate, and that therefore their real estate mortgage preserves to them a lien covering the same superior to the title of the trustee. The property in question included all furniture, electric lamps, draperies, curtains, tapestry, window shades, and carpets. In laying the carpets, a material known as ozite was first glued to the rough cement floor of the rooms; thereupon the carpet was laid over the ozite and glued at the edges thereof —that is, at the walls—and nailed to wooden carpet strips, especially designed and sunk into the walls at the foot thereof and at the edge of the floor, and sunk into the cement. The carpet was all specially ordered, selected, manufactured, made, sewed, and measured to fit the various rooms in the hotel building. The tapestry consisted of certain decorative tapestry hung in the lobby and club rooms, tacked to the wall. Bedroom and table electric lamps were fixed to the electric connections by ordinary sockets. The term "lamps," as here used, does not include electric fixtures. The shades and draperies were hung, as is ordinarily done, upon rollers and rods. The furniture was selected as suitable and fit for the uses to which it was to be put in the said hotel. There are various items of personal property suitable for the use of the hotel, but capable of being moved and used in other locations.

The court is of the opinion that the carpeting comes within the definition of a fixture as defined by the Supreme Court of Illinois in Fifield v. Farmers' National Bank et al., 148 Ill. 163, 35 N. E. 802, 39 Am. St. Rep. 166. The court there stated the elements to be considered in determining what are to be regarded as fixtures as follows: " 'First, real or constructive annexation of the thing in question to the realty; second, appropriation or adaptation to the use or purpose of that part of the realty with which it is connected; third, the intention of the party making the annexation to make it a permanent accession to the freehold, this intention being inferred from the nature of the article affixed, the relation and situation of the party making the annexation, and the policy of the law in relation thereto, the structure and mode of the annexation, and the purpose or use for which the annexation has been made.' * * * 'Of these tests the clear tendency of modern authority seems to be to give pre-eminence to the question of intention to make the article a permanent accession to the freehold, and the others seem to derive their chief value as evidence of such intention.' " The court held that machinery fastened to the floor, or to a plank nailed or fastened to the floor of a building erected for a shoe manufactory by large screws and belted to the shafting was a fixture and part of the freehold.

In McLaughlin v. Johnson, 46 Ill. 163, the court held that rails hauled onto the premises with the intention of erecting a fence, but lying loose upon the land and in no wise attached to the freehold, constituted a part of the realty and passed by a deed, as appurtenances. The latter case is an extreme one, and the Supreme Court of Illinois has somewhat limited that holding in some later cases. In Arnold v. Crowder, 81 Ill. at page 60, 25 Am. Rep. 260, the court approved the holding of the Massachusetts court in the case of Weston v. Weston, 102 Mass. 514, where a bell hung upon a frame, and fastened to it by a hasp, the frame being nailed to the cupola of a barn, was held to be a fixture, and to pass by a conveyance of the land. In the case cited the Supreme Court of Illinois held that platform scales for weighing stock and grain, fastened to sills laid upon a brick wall, constituted a fixture and passed to the purchaser under a decree of foreclosure and sale.

These holdings are based upon the fact that the mode of annexation, the adaptation of the fixture to the use of the realty and the apparent intention of the parties were such as to make the annexation a permanent accession to the freehold. The conclusion is drawn from the nature of the article affixed, the relation and situation of the parties making the annexation, the structure and mode of the annexation and the policy of the law as declared in Illinois. The Illinois cases were reviewed and approved by the Supreme Court in the case of Owings v. Estes, 256 Ill. 553, 100 N. E. 205, 43 L. R. A. (N. S.) 675, where it was held wall cases surrounded at the bottom by a quarter-round molding, which held them snugly to the floor; two substantial racks spiked to the floor or walls, and two hangers of iron, screwed into the ceiling joists were fixtures that passed with the mortgage on the real estate. This rule is in accordance likewise with that adopted quite generally in other jurisdictions. So fences merely resting upon the surface of the ground; heavy machinery not bolted to the floor; fire grates, part of a house; millstones resting upon the top of the perpendicular shaft which turns it; ice boxes unattached to the realty, have in various cases been held fixtures constituting accessions to the freehold.

The annexation is evidence of the intention of the parties. Likewise the adaptation to the use of the improvement is evidence of the intention. Each case must stand upon its own facts, the question at all times being: Does the evidence disclose an intention that the particular thing in question become part of the freehold? In view of the fact that these carpets were cut for the rooms of this particular hotel; that they were glued and nailed to the floor; that they were adapted for use only in those particular rooms, or in such other rooms as might be found of the same dimensions and the other circumstances surrounding the case, the court finds that the parties intended the carpeting should become part of the freehold.

In this connection it is suggested by the trustee that the fact that the mortgagees also took a chattel mortgage securing payment for the same indicates an intention of the parties to preserve the chattel character of the fixtures. The Supreme Court of Illinois in Fifield v. Farmers' National Bank, 148 Ill. 163, 35 N. E. 802, 39 Am. St. Rep. 166, has held that where the facts are sufficient to evidence an intention that the fixtures should become a part of the freehold such action shall not prevent the assertion of a lien under a real estate mortgage. The court there said: "Some importance is attempted to be placed on the fact, in the argument, that appellee the Farmers' National Bank took a chattel mortgage on the property. We do not regard this as an important element in the case. The fact that the bank may have been advised that the machinery was personal property, and attempted to secure its debt by taking a chattel mortgage thereon, would not impair the validity of the deed of trust or mortgage subsequently executed, nor would the acceptance of a chattel mortgage prevent the bank from resorting to any legal remedy it might have to secure its indebtedness." The facts being persuasive to the effect that the carpeting became a part of the realty, the action of the mortgagees in attempting to protect themselves by both kinds of mortgage will not militate against their rights under the real estate mortgage.

The court is of the opinion that the situation as to all other alleged fixtures mentioned is entirely different. The tapestry upon the walls, the tables and beds in the rooms, the settees in the lobby, the chairs, the lamps, and all other similar property obviously never lost their character as personal property, nor in the opinion of the court did the draperies, curtains, and shades. All such property remained suitable to be used in any other location; it was not especially adaptable to this property; it was affixed only by temporary means, and there is nothing in the record to substantiate an intention that it should become an accession to the freehold. The language of the Su-

preme Court in Hunt v. Bullock, 23 Ill. 258, is pertinent. There the property attempted to be held under a real estate mortgage consisted of fuel and office furniture and fixtures used by a railroad in connection with its business. It was suggested that the property was convenient and necessary to the enjoyment of the real estate by the railroad, but the court said:

"Nor has it ever been held that, because personal property is convenient, or even necessary, to the enjoyment of real estate, it should for that reason be held and treated as such. Were such a rule adopted, it would convert almost every description of chattels into realty. The teams, implements, money, and stock of the agriculturist, the capital and stock of the mechanic, the miner, the manufacturer, the merchant, and every man's household furniture and property, would fall fully within the reason of such a rule. Such has never been claimed for individuals, and no reason is perceived in justice, or upon principle, why corporate bodies have any higher or greater claims to such exemptions. * * * In the absence of any common-law rule, or statutory enactment making these articles real estate, we must hold, whether they be owned by a railroad company or an individual, that they are personal property, and as such are subject to all of its incidents. To hold otherwise would be to violate elementary principles, recognized and acted upon wherever the common law obtains. * * * If * * * articles of personal property may be regarded as franchise, simply because it is convenient to enable railroad companies to exercise their privileges, and we are, for that reason, to infer that the Legislature intended to exempt such property from sale, it must follow that the same rule of interpretation, and for precisely the same reason, must exempt such property from sale, when owned by a bank or other moneyed corporation. If such a rule were adopted in favor of these bodies, it must be obvious that they would be at once placed above and beyond all legal control, enabling them to retain all of their property in despite of their creditors. They might thus avoid paying their taxes, and refuse to perform every duty imposed by their charter. If applied to banks, they could refuse to redeem their bills, and hold the very property purchased with them, in defiance of a judgment and execution. So of insurance, manufacturing, and other corporate bodies."

The court finds no evidence in this record to take the chattels in question out of their character of personal property, or to establish an intention upon the part of any of the interested parties that they should be considered as other than personal property.

The order of the referee will be disapproved and set aside as to the carpeting, and the mortgagees shall be allowed a lien upon the pro rata share of proceeds of sale represented by the item of carpeting. The order of the referee denying the trustees a lien upon any other alleged fixture is approved and affirmed.

### Claim of Arthur A. Marer & Co. for an Original Contractor's Mechanic's Lien.

The court is of the opinion that the referee's order with respect to the claim of Arthur A. Marer & Co. for a general contractor's mechanic's lien should be approved and the claim denied. The referee has at some considerable length stated the facts with regard to this claim, and it would serve no good purpose to reiterate the same. If any part of the claim for lien could be allowed as a mechanic's lien, it is that for carpets, of the value of $47,440.25. These carpets were glued and nailed to linings, which were likewise glued to the floor; but, if it be admitted that such carpets became a part of the real estate and contributed to the improvement thereon, the claimant is in no position to urge a mechanic's lien for the same, for the reasons stated fully by the referee. The claimant took a mortgage upon the real estate securing the purchase price of the same, and this mortgage by its terms was made subject to the real estate mortgage securing the bonds. Consequently, if the carpets became a part of the real estate by the act of claimant, the first mortgage thereon is superior to the express lien of the claimant embraced in its second mortgage.

Furthermore, its action in taking the mortgage indicated plainly a desire to rely, not upon a claim for mechanic's lien, but upon a mortgage, subject to a superior mortgage. Furthermore, the claimant wrote a letter to the trustee for the bondholders, in which it agreed that, if the bondholders would proceed to distribute the proceeds of the bonds, it would waive any and all claims of lien of any and every character, except as preserved by contract. From the evidence it is clear that the bondholders relied upon the waiver embraced in the second mortgage of the claimant and in this letter, and whether the letter was under seal or not, having been relied upon to the detriment of the trustee, the same creates an estoppel as against the claimant, efficiently and completely preventing the recognition of any claim for lien by any court of equity.

The remaining items, for the reasons stated by the referee, are not of such character as can be made the basis of a mechanic's lien. They remained personal property. They became no part of the improvement to the real estate. They were removable chattels, suitable to be used in similar situations in other places.

The court approves of the findings and conclusions of the referee in all respects with regard to this claim. His order will be approved, and the claim for lien denied. The allowance of the claim as a general claim is approved.

This claimant shall not be considered as one of the materialmen hereinafter held to be beneficiaries of the balance of the proceeds of sale of bonds ordered delivered by Caldwell & Co. to the trustee. The estoppel above mentioned operates against the enjoyment of such benefit.

The Claim of Charles Benson, Inc., and Ætna Casualty & Surety Company, as Assignee Thereof for Contractor's Mechanic's Lien:

This claimant was the original contractor for the improvement. His assignee is the surety company which executed the bond insuring his completion of the same. After careful consideration of the record, the court is of the opinion that the referee's order upon this claim should be approved. The court is convinced, first of all, that there is no money due the contractor, that the actual amount claimed by him is $152,198.26, and that, if said amount is due him, there should be deducted therefrom the amount allowed subcontractors, $131,392.09, the amount required to complete the contract of $1,550, the amount paid Erickson, $10,860, the discount retained by Benson of $2,887.43, and that amount of the extras properly payable in stock of $3,291.57, constituting a total of $149,981.09. When this is deducted from the sum of $152,198.26 claimed by Charles Benson, Inc., there is left a balance of $2,217.17, which is less than the amount of accrued interest upon the subcontractors' liens, which is properly allowable to the subcontractors. Further, under the facts as found by the referee and as disclosed by the record, under the decision of the Supreme Court of Illinois in the case of Heidenbluth v. Rudolph, 152 Ill. 316, 38 N. E. 930, claimant is clearly estopped to set up any claim for mechanic's lien as against the mortgagees. His misrepresentations of fact were inducements to the payments of sums of money by the disbursing agent on the sale of bonds, which clearly would not have been paid except for his representations. It is unnecessary to discuss all of the facts. They appear clearly in the record. The referee found the facts to be such that the claimant is estopped. He saw all of the witnesses, and the court is of the opinion that the record clearly substantiates his conclusions, and that he might have gone much further in his findings and conclusions of fraud upon the part of Benson, the chief executive officer of Benson & Co.

It is said that his misrepresentations were made as the representative of the owner of the property, and not as contractor, but it should be observed that each payment made in pursuance of and in reliance upon Benson's representations was made to Charles Benson, Inc. This claimant benefited by its chief executive officer's fraud. It misled Caldwell & Co. and the bondholders. It has no standing in a court of equity. The referee's report upon this claim is approved.

Nothing hereinafter contained shall be construed to give to this claimant any share in the fund ordered paid by Caldwell & Co. to the trustee. The estoppel mentioned operates against such sharing.

Claims of O. K. Yeager, Carson-Payson Company, and E. M. Weiner Company for Subcontractors' Mechanics' Liens.

The referee allowed each of these claimants a subcontractor's lien for material furnished the original contractor, Charles Benson, Inc. There is no serious controversy as to the amount due each of them. The claimants complied with the mechanic's lien law of the state of Illinois in protecting their claims. They furnished material and labor, which went into the improvement of the real estate. It is contended that they are estopped to claim mechanics' liens for the reason that each gave to Charles Benson, prior to the execution of the mortgage and prior to the delivery of the proceeds of the bonds, waivers of liens aggregating $115,000, for material and labor which had not been furnished. It appears from the record that Benson had a profit in his original contract in excess of the sum of $115,000, that he approached those claimants and said to them that he was about to procure a surety bond for the completion of the building, and, in substance, that in order to procure the same it was necessary for him to show that his subcontracts equaled the total amount of his contract. Accordingly he asked each of them to execute a so-called waiver of lien, in which the actual amounts of the subcontracts, by prorated additions, were increased by a

total of $115,000 over and above the stipulated contracted amounts. In these waivers each of the claimants overstated the amount of his contract by his pro rata share of the $115,000, and then stated that an amount of labor and material equal thereto had been delivered and paid for, and that there remained a balance due, which in each instance amounted to the exact amount of the original subcontract. This material and labor had then only in part been furnished, but the true amount due each of the claimants was stated, the complaint being that said amount was stated as a balance due, rather than as the original contract price.

Why these claimants allowed themselves to be induced by Benson to make these statements is difficult to understand. The appeals of commercial integrity to their consciences should have told them that no good purpose could be served by the execution of an ambiguous or a misleading statement. But it appears clear that none of them contemplated that this statement should be used in any way for the purpose of misleading the bondholders, nor does it appear possible that said statements could have deceived the bondholders, in view of the fact that they stated in each instance the true amount to become due. The record substantiates the referee's finding that the statements were made without any intention that they should be communicated to the bondholders, without any intention that they should be relied upon by anybody furnishing funds, and that they did in fact state the true amount due or to become due each of the subcontractors. The claimants yielded to the persuasion of Benson to help him in the procuring of the bond for the completion of the building in which he had a substantial profit, but beyond this they did not go. In good faith they furnished the material and labor required by their subcontracts. They received nothing more or other than as provided in their contracts. As the material and labor was furnished, they received actual payments for what became due, and finally, after deducting the payments made to them from the balances stated in their original statements delivered to Benson, there remained due them substantial amounts, for which the referee has found they are entitled to mechanics' liens.

The court is not favorably impressed by these statements. Claimants should not have allowed Benson to prevail upon them to sign as he requested. But the court has searched the record to ascertain whether there is any evidence that these acts were of such character as to create an estoppel, and its conclusion is that the facts are not sufficient to estop any one of the claimants. Caldwell & Co. was under contract to purchase the bonds long prior to the so-called waivers; consequently, nothing therein contained was an inducement to Caldwell & Co. to make the purchase of bonds. Nor is there any estoppel as against the trustees who became the mortgagees at a later date, for the balances due and to become due were correctly stated. These claimants did not do what the owners did in Heidenbluth v. Rudolph, 152 Ill. 316, 38 N. E. 930, or in Commercial Loan & Building Ass'n v. Trevette, 160 Ill. 390, 43 N. E. 769. In the first mentioned of these cases the court said: "They also admitted in their testimony that they understood the receipts and false contracts were to be used to aid in procuring larger loans than could be obtained on the lots, if the contract price of the buildings was truly stated." In the second mentioned case the contractor himself presented the architect's certificates and falsely stated the balance due the contractor. There was no such misstatement in any of the instant cases. The court concludes that the acts and statements of the claimants are consistent with good faith, that no injurious result could have been foreseen or anticipated by them, and that they are not estopped to assert their liens. 10 R. C. L. § 20, p. 692; 21 C. J. p. 1122.

The court is of the opinion that the finding and conclusions of the referee in respect to these three claims should not be disturbed. It appears, however, that the referee allowed to the Danville Brick Company, a party furnishing materials to Yeager, a claim in the sum of $2,790.59, and that said amount was deducted from the amount allowed Yeager in this claim. This court has disapproved said lien allowed the Danville Brick Company, and the amount due Yeager & Son should therefore be increased by the amount of $2,790.59. In all other respects the order of the referee with regard to these three claims is hereby approved and confirmed.

### Claim of Clifford Shields for Subcontractor's Mechanic's Lien.

The only question raised as to the claim of Clifford Shields for a subcontractor's mechanic's lien for labor and materials is whether or not the claimant complied with the requirements of the statute of Illinois within the time prescribed by that statute for the perfecting of his lien. Section 21 of the mechanic's lien law of the state of Illinois (Smith-Hurd Rev. St. 1927, c. 82), gives to

subcontractors a lien for the value of the material and labor furnished, "with interest on such amount from the date the same is due." Section 24 of the same act requires that subcontractors shall within sixty days after the completion of their contract, or if extra or additional work or material is delivered thereafter, then within sixty days after the completion of such extra or additional work, cause a written notice of his claim and the amount to become due thereunder to be served on the owner, or his agent, or architect, or superintendent having charge of the building or improvement. Section 33 of the same act provides that suit shall be commenced "within four months after the time that the final payment is due the subcontractor."

The Supreme Court of Illinois has held that a bill in equity filed to foreclose a subcontractor's mechanic's lien which does not disclose the date when final payment became due, and thus afford to the court information as to whether suit has been filed within four months of such time, is fatally defective as failing to state a cause of action, and cannot be amended after the expiration of four months from the date of final payment. North Side Sash & Door Co. v. Hecht, 295 Ill. 515, 129 N. E. 273. In the instant case the claimant filed his suit for foreclosure of his subcontractor's mechanic's lien in the circuit court of Vermilion county, Illinois, on April 15, 1927. In that suit the complainant did not directly aver when final payment became due him, but his bill did aver that extra materials in substantial amount were ordered by authorized persons on December 15, 1926, that notice of lien was served upon the owner on February 4, 1927, and that the total amount due included the amount represented to be the value of the materials and labor furnished and interest thereon from January 14, 1927. The bill of complaint was filed April 15, 1927. The necessary implication of these averments is that the furnishing of the material and labor, including the extras, was completed after December 15, and before April 15, obviously on January 14, 1927.

The bill was defective as a pleading, but because of the necessary implication aforesaid it did not wholly fail to state a cause of action. It could have been amended after the four-month period had expired, and, though defective, it contains sufficient information to show that complainant was claiming final payment was due January 14, 1927, a date within four months of the time when it was filed. In this respect the instant case differs from the case above cited.

The referee's order allowing the claim for lien is hereby approved and confirmed.

### Claim of Danville Brick Company for a Subcontractor's Mechanic's Lien.

The Danville Brick Company filed its claim for a mechanic's lien as a subcontractor of O. K. Yeager for brick used in the construction work done by Yeager in the improvement of the real estate. The last of the material was delivered by claimant on January 17, 1927, upon invoices providing that the terms were 2 per cent. 10 days, net 30 days. If these invoices be accepted as fixing the date of payment, ignoring the absence of any provision to that effect in the written contract offered in evidence, it follows that final payment was due this subcontractor on February 17, 1927.

Section 33 of the Mechanic's Lien Act provides that, in order to maintain a lien, a subcontractor must file his suit to enforce the same within four months from the time that the final payment became due said subcontractor. The claimant on May 24, 1927, filed its suit to enforce its claim for lien in the circuit court of Vermilion county in the form of an answer, seeking affirmative relief to a bill filed by another mechanic's lien claimant. Under the Illinois practice such procedure is an approved method of filing suit to enforce a mechanic's lien. However, the answer filed stated "that the purchase price of said brick was to be paid for upon delivery, and that the last of said brick was delivered on January 17, 1927," and that "the sum of $6,978.73 was justly due and payable to this defendant from the said Yeager on the day when the last of said brick was delivered, viz. January 17, 1927." According to the pleading of the claimant in this answer, the last payment became due January 17, 1927, and under the statute the time for filing suit to enforce the same expired on May 17, 1927, seven days before the date when this answer was filed. Under the Illinois law, as determined by the Supreme Court of Illinois, this answer did not state a cause of action, for the reason that it appeared therefrom that the suit was not filed within the statutory time. See North Side Sash & Door Co. v. Hecht, 295 Ill. 515 at 519, 129 N. E. 273.

After demurrer to the said answer had been filed the claimant on October 5, 1927, filed an amended answer in which it was alleged "that a credit of thirty days,

was allowed for the payment of brick so delivered as aforesaid, immediately following the delivery of said brick; that said brick were delivered on January 17, 1927," and that "the sum of $6,976.75 was justly due and payable to this defendant on February 17, 1927." Under the theory of claimant, as disclosed in this amended answer, the time within which suit to enforce claimant's lien could be filed expired on June 17, 1927, and claimant contends that the amendment cured any defect in the original answer. However, under the decision of the Supreme Court of Illinois above mentioned, if the original pleading in a suit to enforce a mechanic's lien fails to state a cause of action, because the allegations of fact show that suit is not filed within the time limited by law, any amendment to perfect the same must be filed within the four-months period, and inasmuch as the amendment for the first time states a cause of action, if it is filed after the four-months period, under the statute the claimant cannot succeed.

The language of that court is directly pertinent: "As we have seen, section 11 of the Act [Hurd's Rev. St. 1917, p. 1876] makes the date of the last delivery of material an essential and necessary averment, and section 7 limits the right of recovery to those cases where the bill or petition is filed within four months after the date of the last delivery of materials. It appears from the face of the original bill that the last delivery of material was on February 27, 1915, which was more than four months prior to February 19, 1916, the date of the filing of the bill. It was essential to the jurisdiction of the court that the bill show on its face a cause of action. A cause of action includes every fact necessary for the complainant to prove to entitle him to succeed—every fact that the defendant would have a right to traverse. Walters v. City of Ottawa, 240 Ill. 259 [88 N. E. 651].

A want of allegations in the bill to sustain the relief sought is as fatal as the lack of proof to show complainant entitled to such relief. Fletcher's Eq. Pl. & Pr. § 87. The time fixed for commencing an action under the Mechanic's Lien Act is a condition of the liability and operates as a limitation of the liability itself, and not of the remedy alone. The provision of the statute creating the lien, requiring suit to be brought within four months, is more than an ordinary statute of limitations. It goes to the existence of the right itself. It is a condition attached to the right to sue at all. It is a condition precedent to the right of recovery granted by the act that the action be brought within four months after the date of the last delivery of materials. Inasmuch, therefore, as the limitation of the time in which to sue is considered not merely of the remedy, but of the right of action itself, and the cause of action exists subject to the limitation, the bill must allege or state facts showing that the action is brought within the time prescribed by the statute. 18 R. C. L. 986; Hartray v. Chicago Railways Co., 290 Ill. 85 [124 N. E. 849]; Sharp v. Sharp, 213 Ill. 332 [72 N. E. 1058]. By the amended bill, which was filed September 16, 1916, this essential averment was made, and it must be held that the suit was not begun until the amended bill was filed. Story's Eq. Pl. (6th Ed.) § 904; Bishop v. Chicago Railways Co., 290 Ill. 194 [124 N. E. 837]. This being true, appellee failed to bring suit within the four-months period required by the statute, and it therefore established no lien, and was not entitled to have a lien on the property of appellant." North Side Sash & Door Co. v. Hecht, 295 Ill. 515, 129 N. E. 273. Inasmuch as the federal court is bound by the interpretations of the statutes of Illinois by the Supreme Court of that state, this court is powerless to entertain the claim here made, for the reason that the statutory cause of action to enforce claimant's alleged lien was never filed by the claimant within four months subsequent to the date when the final payment became due.

The claimant relies upon the cases of Eisendrath Co. v. Gebhardt, 222 Ill. 113, 78 N. E. 22, and Treloar v. Hamilton, 225 Ill. 102, 80 N. E. 75. We find no inconsistency between the first of the cases and the instant case, and if any inconsistency appears between the second mentioned case and the case of the North Side Sash & Door Co. v. Hecht, 295 Ill. 515, 129 N. E. 273, the express and clear holding of the Supreme Court in the later case must prevail. As a matter of fact, in the last-mentioned case the Supreme Court pointed out that the two cases cited were to be distinguished from the case then being considered, and clearly indicated that, if anything contrary to the then holding appeared in the prior cases they were no longer to be considered as the law. The court finds no unsettled character in the decisions of the Supreme Court at the present time, and therefore feels compelled to follow the Supreme Court of Illinois in its interpretation of the statute before us.

The order of the referee allowing the claimant a lien is hereby disapproved and set

aside, and the claimant's claim is hereby denied. The claimant must be limited to its remedies against the contractor, O. K. Yeager, and those against the fund herein elsewhere ordered paid by Caldwell & Co. to the trustee, in which it is one of the beneficiaries, or those of a general creditor.

#### Claim of Hartmann & Co. for Subcontractor's Mechanic's Lien.

The referee found that this claimant had complied with the statute and was entitled to a lien. It is now contended by the mortgagees that the notice required by section 24 of the Mechanic's Lien Act, which according to the statute shall within 60 days after the completion of the subcontract be served upon the owner or his agent, was not served in compliance with the statute. The evidence is that this notice was served within the time required by law upon the attorneys for the owner. These attorneys were apparently of the character of general counsel, attending to all legal matters for the owner, and it is only plausible to assume that such attorneys come within the meaning of the word "agent," as used in the statute. But it is not necessary to make such an interpretation of the facts, for the evidence is further that the attorneys, within a day or two after the receipt of the notice and within the time provided by statute, delivered the notice to one of the executive officers of the corporation owning the property. This was sufficient compliance with the statute. It is necessary only that the notice be brought to the attention of the owner within the time prescribed by law, and whether that act be performed by the claimant or by some other person is wholly immaterial.

The order of the referee with regard to this claim for lien is approved and confirmed.

#### Claim of Vermilion County Telephone Company for Original Contractor's Mechanic's Lien.

This claimant contracted directly with the owner of the property to furnish telephone service for the hotel. Such service included the installation of 199 telephone stations within the hotel, the switchboard and its connections being treated as one of the stations, at a total charge of $696.50. The claim for lien is for this charge. The property, including the telephone switchboard and instruments and wiring necessary for the installation of the system, was not purchased or agreed to be purchased by the owner, but remained the property of the claimant. The charge, according to the contract, is "a certain connection charge of $3.50 for every station, including the switchboard as a station," and is allowed by the Illinois Commerce Commission in addition to the charges made per month or year for telephone service. Claimant contends that making the installation of the property was necessary to the completion of the hotel as a whole and enhanced its value.

Under the Illinois statute, mechanics are allowed liens only for fixtures which become a part of the permanent improvement of the real estate. As the Supreme Court says: "'If it is stationary and firmly attached to the realty, so as to become a part thereof, it is the subject of a lien; otherwise, not.' * * * It was necessary to allege and prove that the things for which a lien was claimed were so attached to the building or improvement as to become a part of the real estate." Haas Electric & Mfg. Co. v. Amusement Park Co., 236 Ill. 452, 86 N. E. 248, 23 L. R. A. (N. S.) 620, 127 Am. St. Rep. 297. Consequently there can be no lien for any of the stations, switchboard, or wiring. The question remains as to whether there could be a lien for the labor in installing fixtures that did not become a part of the realty. Apparently it follows from the reasoning of the Supreme Court that, if the material or apparatus did not become a part of the realty, if the property therein did not pass to the owner, if it did not become a part of the real estate, the labor for installing the same cannot be treated as labor for which a lien will be allowed under the statutes of the state of Illinois.

The trend of the Illinois decisions seems to support this conclusion. In The Fehr Construction Co. v. Postl System of Health et al., 189 Ill. App. 519, it was held that there could be no lien for lockers, racks for letter files, and shelves for stenographers' desks placed in the building under contract with the tenant, to be used for the latter's convenience and business. In Bouton v. Board of Sup'rs of McDonough County, 84 Ill. 394, the Supreme Court held that a mechanic's lien covers nothing except property which may be reached by an execution against the real estate. Even though the installation of the telephones may have been a benefit to the building, in view of the fact that the title to the property was retained, and that the latter never became a part of the real estate, the charge for installation thereof cannot be the basis of a claim for lien. The court suggests, also, that if any of the labor furnished is of such character as to support valid claim for lien, it is impossible to de-

174

termine from the evidence what part is of such nature and what part is not. Under such circumstances a lien cannot be allowed. Haas Electric Co. v. Amusement Co., 236 Ill. 452, 86 N. E. 248, 23 L. R. A. (N. S.) 620, 127 Am. St. Rep. 297.

The order of the referee allowing the lien is hereby set aside, and the claim for lien is dismissed. The matter will again be referred to the referee, with directions to allow a general claim against the estate.

### The Controversy Between the Trustee in Bankruptcy and Caldwell & Co.

After the trustee filed on October 26, 1927, his petition to marshal the assets and to sell property of the bankrupt estate free from liens, Caldwell & Co., respondent named therein, appeared first by special appearance objecting to the jurisdiction of the court. Later, however, in order to facilitate the determination of the controversies existing, Caldwell & Co. entered its full appearance and filed its answer to said petition. The trustee asserts that $40,762.43 in the hands of Caldwell & Co. at the time of the adjudication in bankruptcy should be delivered to the trustee. The referee so ordered. The trustee also asserts that the sum of $8,227 paid to one L. B. Stevens by Caldwell & Co. for supervising the construction of the building, and further sums aggregating $22,714.47 paid to the mortgagees, were not authorized, and that all of same should likewise be paid to the trustee. The referee found against this contention.

Caldwell & Co. is an investment house, which entered into an underwriting agreement with the hotel company at the time the issuance of bonds and the execution of a mortgage securing same were under contemplation. Paragraph 6 of that agreement is as follows: "The underwriter underwrites said entire issue of bonds at the sum of $630,000, which sum and no more, such underwriter is bound to account for to the owner in a disbursement and in accordance with the terms and provisions of this agreement." Section 14 is as follows: "In consideration of the discount received on said bonds by the underwriter, the underwriter assumes full responsibility for the sale of said bonds, and for paying over and depositing in the bank or banks selected, the sum of $630,000, which the owner is to receive for said bonds, and agrees to supervise the progress of the construction of the building and make disbursement of payment of the proceeds of said bonds from time to time on vouchers for materialmen, contractors, sub-contractors, laborers, or others on the orders of the owner and architect's certificates approved by consulting architect upon receipt of the necessary waivers of liens and affidavits, which have the effect of waivers of liens satisfactory to the underwriter and shall generally supervise the erection of the building and the disbursement of the moneys employed in said building to the end that this contract shall be carried out so as to fully protect the purchasers and holders of said bonds."

In section 19 it is provided that the owner will pay all expenses incidental to the bond issue, but Caldwell & Co. agrees that these expenses, exclusive of abstract fees, will not exceed the sum of $3,500. Section 23 provides that the proceeds of the bond issue will be disbursed in accordance with the agreement monthly on architect's and owner's certificates to the extent of 85 per cent. of the labor and material incorporated in the work, and that 15 per cent. shall be retained until final completion and acceptance. Section 4 provides that in order to assure the accumulation of a sufficient fund to retire the bonds each year when due, the owner—that is, the bankrupt—agrees to pay to Caldwell & Co. one-twelfth of the amount payable in each year, except the last year, on the 1st day of each month in said year. The date of the first payment for interest installment was March 1, 1926. Under section 14 it was provided that the underwriter, Caldwell & Co., if it sees fit to do so may pay off and discharge from any of the proceeds of said bonds any claim or lien upon said building for labor or material. Section 9 provides that the underwriters may keep on hand sufficient moneys to complete the building free of liens prior to trust deed contemplated, and that it shall stop disbursements of such proceeds at any time until such deficiency is made up by the owner. At the time of bankruptcy there was in the hands of Caldwell & Co. undistributed, as a part of the proceeds of the bond issue covered by the foregoing provisions, the sum of $40,762.43. This sum it claims to have a right to hold under the provisions of the underwriting agreement, hereinbefore mentioned, for the benefit of the Liberty Central Trust Company, trustee under the mortgage securing said bonds.

It appears beyond question that the agreement when considered in its entirety was that of an underwriter of bonds, as defined in Busch v. Stromberg-Carlson Telephone Mfg. Co. (C. C. A.) 217 F. 328, Stewart v. Miller & Co., 161 Ga. 919, 132 S. E. 535, 45 A. L. R. 559; 1 Cook on Corporations (7th. Ed.) 74, and 1 Fletcher, Cyc. Corporations, § 442.

Caldwell & Co. is at all times treated by the agreement itself as "underwriter." It undertook to underwrite the entire issue of bonds for the sum of $630,000, giving it a profit, if it sold the bonds at par, of $70,000. The underwriter assumed full responsibility for the sale of the bonds. These facts and the intent and meaning of the contract, considering the relationship of the parties, is such as to amount to a relationship of an underwriter of bonds and not the relationship of a broker lending money.

However, Caldwell & Co. was more than a mere underwriter. It also agreed to act as disbursing agent of the proceeds of the bonds in the manner hereinbefore mentioned. It was clearly the intent of the agreement that the proceeds of the bonds should be paid directly to the contractor or his subcontractors furnishing labor and material for the improvement of the real estate. The parties contemplated that the proceeds of the bonds and of the secondary financing would be sufficient to take care of the entire cost of the improvement, and to assure Caldwell & Co. as underwriters distributing bonds to the public that the building would be completed, the parties stipulated that Caldwell & Co. should disburse payments due to material and labor men. The trust deed in the absence of waivers was invalid as to all lienholders for labor and material, and it was to prevent such prior liens that the parties stipulated that the proceeds of the bonds should be disbursed as mentioned. The simplest transaction out of which a trust will be implied is that of money or other property delivered to a person to be by him paid or delivered over for the benefit of a third person. In such a case a trust necessarily arises in favor of the beneficiary, though there is no express agreement to that effect. 26 R. C. L. 1200; McKee v. Lemon, 159 U. S. 317, 16 S. Ct. 11, 40 L. Ed. 165. In the case cited the court said: "There can be no doubt of the general proposition that where money is placed in the hands of one person to be delivered to another, a trust arises in favor of the latter, which he may enforce by bill in equity, if not by action at law. * * * It is true that in this case the names of the beneficiaries are not given in the instrument creating the trust, but they are designated by class as 'all parties who have rendered service heretofore in the prosecution of said claim.' * * * And if there be any conflict between individuals of such class, a court of equity is the proper tribunal for the adjustment of their respective claims." This holding has been followed and in various phases of the proposition discussed in Thompson v. Emmett Irr. District (C. C. A.) 227 F. 568; Board of Com'rs v. Tollman (C. C. A.) 145 F. 773; United States v. National Bank (C. C.) 73 F. 384; Coler v. Board of Com'rs (C. C.) 89 F. 260.

A trust enforceable in equity arises, where, with the assent of the beneficiary, one who could not acquire an interest in a benefit or insurance certificate, because not bearing the necessary relationship to the member, agrees to pay the dues in consideration of an agreement with the member that the benefit shall be collected for his benefit and paid to him. Kerr v. Crane, 212 Mass. 224, 98 N. E. 783, 40 L. R. A. (N. S.) 692; Peek's Ex'r v. Peek's Ex'r, 101 Ky. 423, 41 S. W. 434; Clark v. Callahan, 105 Md. 600, 66 A. 618, 10 L. R. A. (N. S.) 616, 12 Ann. Cas. 162; Coyne v. Supreme Conclave, I. O. H., 106 Md. 54, 66 A. 704, 14 Ann. Cas. 870; Cowin v. Hurst, 124 Mich. 547, 83 N. W. 274, 83 Am. St. Rep. 344; Devries v. Hawkins, 70 Neb. 656, 97 N. W. 792; Steller v. Sell, 55 N. J. Eq. 530, 37 A. 1010; Hirsh v. Auer, 146 N. Y. 13, 40 N. E. 397; Schomaker v. Schwebel, 204 Pa. 470, 54 A. 337; Crews v. Crews', Adm'r, 113 Ky. 152, 67 S. W. 276. The situation is not unlike that before the court in the case of Western Tie & Timber Co. v. Brown, 196 U. S. 502, 25 S. Ct. 339, 49 L. Ed. 571. Caldwell & Co. was for certain purposes the agent of the bankrupt. As such agent the funds it held as proceeds of the bonds were held in trust for the bankrupt, and for the parties who were creating the improvement on the bankrupt's property. The first beneficiaries were such parties as furnished material and labor. If any balance remained after completion of the improvement, it belonged to the owner.

This situation existed on the date of the adjudication in bankruptcy, and after that time the trustee in bankruptcy occupied the position of a creditor armed with an execution and succeeded to the rights of the bankrupt with a title superior to that of any and all persons other than and except prior lienholders. The money held in trust for the owner passed to the trustee, impressed with the further obligation, however, that the trustee, when same should be received, should hold same in trust for the discharge of construction costs. In other words, the parties first having access to this fund in equity are those who furnished the labor and material necessary to complete the improvement. To hold otherwise would be to allow the underwriter to turn over to the bondholders moneys received from the proceeds of sale of a lien,

that is the trust deed, secondary, subsidiary, and inferior to the rights of the parties furnishing the labor and material. To permit Caldwell & Co. to retain the same and pay it to the trustee would be to divert from the lienholders and material and labor men proceeds of sale of the improvement which the latter have created, and to make the mortgage, to the extent of such retention, superior to the mechanics' liens. The doctrine of set-off does not apply in such situation, for the debts are not mutual.

Equity will do its utmost to prevent improper diversion of a fund impressed with a trust in favor of certain individuals. The conclusion of the court is that the order of the referee as to the sum of $40,762.43 should be and the same is hereby approved; that the said sum should be paid to the trustee in bankruptcy and by him applied upon amounts due and unpaid for labor and material, deducting, however, such reasonable costs of administration as shall hereafter be adjudged by the referee. The payment to the beneficiaries shall be prorated in accordance with the respective amounts due them, as finally determined by this court or any court of review. Obviously the parties who furnished the material and labor necessary to complete this improvement to the real estate, constituting the security of the mortgagees, being beneficiaries of the proceeds of sale, independent of the mechanic lien statute, are entitled to share in this distribution of the trust funds, regardless of whether they have established mechanics' liens or not.

As to the sum of $8,227 paid to one L. B. Stevens the court is of the opinion that the referee's order must be reversed. Caldwell & Co. paid this sum to the said Stevens and justifies the payment by section 14 of the contract, which as we have seen provides that the underwriter shall have the privilege of employing a consulting architect or architects, whose fees, not exceeding 10 per cent. of the contract price, shall be borne by the owner. Engineers, architects or contractors employed by such consulting architect, or by the underwriter, were to be allowed to enter the premises at any time during the construction of the building. We have seen likewise that section 19 provides that the owner shall pay all incidental expenses of the bond issue, but that the underwriter covenants that they shall not exceed the sum of $3,500, and that such expense is to cover the printing of bonds, the legal expenses, etc. Stevens was not an engineer; he was not an architect. He did perform supervisory work for Caldwell & Co. in pursuance of its duties as outlined in the foregoing sections. There were regularly employed architects in charge of this construction who received very liberal fees. Apparently Stevens was employed to safeguard the interests of Caldwell & Co., but no reason appears why the owner should pay his fees as a supervising architect or engineer, when he was not of such character or profession. Under the terms of the contract the court is of the opinion Mr. Stevens' compensation must be satisfied from the profit of Caldwell & Co. as underwriter. It was the duty of Caldwell & Co. to furnish the general supervision as a part of its contract. Its entire profit was to be $70,000. Why its agents in performing its general supervision should be paid by the owner is not apparent to this court. The referee's order with regard to this sum will be reversed and Caldwell & Co. will pay to the trustee the sum of $8,227, which shall be impressed with the same trust relationship as the $40,762.43 hereinbefore mentioned.

There is a further item of $15,487.47, being part of the proceeds of the sale of bonds, which Caldwell & Co. delivered to the mortgagees shortly prior to the bankruptcy proceedings. Inasmuch as we have said that all proceeds of bonds were impressed with the trust for the benefit of those furnishing construction labor and material, it follows that this payment to the trustee under the trust deed was erroneous and in violation of the said trust relationship. In the opinion of the court it was beyond the power of the bankrupt and the underwriter to agree to divert funds from the materialmen to the mortgagee. The referee's order in this respect must be reversed as to the sum of $15,-487.47. The same shall be paid to the trustee in bankruptcy to be held and distributed by him in accordance with the trust relationship hereinbefore found to exist, less such costs of administration as the court shall hereafter determine.

### Costs.

The question of taxing costs is one which the court cannot finally dispose of until it is determined whether the orders entered by this court are to be final or whether they are to be modified upon review. However it may be well to make a few observations concerning the same. It is quite generally recognized that the costs and expenses for the preservation of the property involved and of its sale are to be paid out of the particular fund derived from the sale of such property, where the sale is one of assets free from liens. It follows that all of the expenses of preserving the property in this estate

and of its sale must be paid out of the proceeds thereof.

[redacted] Further than that it appears quite generally true that, where a recovery is by the trustee in bankruptcy for the benefit of materialmen, such beneficiaries shall contribute to the fees and expenses necessitated by the recovery. Consequently, as to the recovery by the trustee of the sums from Caldwell & Co. elsewhere mentioned herein, though the same be impressed with a trust in behalf of the materialmen and as to personal property, relief for which is denied Caldwell & Co., the trustee, being the party who sought to recover therefor and pursued the same for the benefit of the estate, will be entitled to his reasonable fees for compensation to himself and his counsel for the services thus rendered.

[redacted] Furthermore, it would appear that, if the respective lienholders had remained in the state court, and if the mortgagees had there filed their bill to foreclose, there would have been a great number of actions brought with resulting accumulation of costs. How many appeals would have been taken to the Supreme Court of Illinois, how many master's sales would have been necessary, how many fees of masters upon references would have been imposed upon the funds, it is impossible to determine. Certain it is, however, that by a sale of the assets free and clear of liens the trustee has achieved a result whereby equities of redemption are cut off, with resulting benefits to lienholders, whereby several causes of action have been merged and combined in one, whereby the costs of a number of sales have been merged in one, and whereby other costs that might have been incurred have been saved. Consequently, the funds in the hands of the trustee must be subjected to certain impositions for the costs of this court in the administration, marshaling and disposition of the res of the estate. How much, if any, will be left for general creditors, and how much of the estate may be subjected to the liability for costs and expenses, how much the respective lienholders have been benefited by the action of the trustee in the recovery of the money from Caldwell & Co. and in the manner in which the estate has been administered, how much the trustees under the general mortgage may have been benefited, and how greatly their funds should contribute to the costs and expenses, are all questions that must be determined by the referee when final determination of all issues has been had. It is sufficient to say that the rules to be followed as to costs and expenses are the ordinary equity rules and that the referee must appeal thereto for guidance.

With these observations the matter of costs will be left to the referee for final disposition upon final adjudication of all issues herein involved. If such order involves a modification of the referee's order, this order will be so understood as modifying the same to such extent.