## McKEE *v.* LAMON.

## LAMON *v.* McKEE.

APPEALS FROM THE SUPREME COURT OF THE DISTRICT OF COLUMBIA.

Nos. 33, 34. Argued and submitted March 13, 14, 1895. — Decided October 21, 1895.

Where money is placed in the hands of one person to be delivered to another, a trust arises in favor of the latter, which may be enforced by bill in equity, if not by action at law.

The acceptance of money, with notice of its ultimate destination, is sufficient to create a duty on the part of the bailee to devote it to the purpose intended by the bailor.

In enforcing such a trust a court of equity may make such incidental orders as may be necessary for the proper distribution of the fund.

On the facts set forth in the headnote to *Gilfillan* v. *McKee,* just decided, it is in this suit, further *Held,*

  (1) That when the Choctaws transferred the work from Black & Lamon to McKee, there was no intention on the part of anybody to ignore what had already been done ;

  (2) That Lamon, as representing the surviving partners of Black, Lamon & Company, was entitled to recover the reasonable value of their services from the date of the assignment by McPherson to the date of the McKee contract.

THESE cases were argued in connection with *Gilfillan* v. *McKee* and *McPherson* v. *McKee, ante,* 303. This was the original bill therein referred to filed against McKee by Lamon and Black, surviving partners, and was based upon the assignment of the original Cochrane contract for a compensation of thirty per cent to Jeremiah S. Black, and the substitution of Black, in the place of Cochrane, as the attorney, counsel, and agent of the Choctaw Nation for the prosecution of their claim. This contract was entered into between McPherson, as the executor of Cochrane, and Jeremiah S. Black, on the 8th of November, 1866, and was assented to by the delegates of the Choctaw Nation, whereby the right of Cochrane to receive the thirty per cent became vested in Black. This assignment seems really to have been made for the benefit of Lamon, who raised and paid $25,000 of the $75,000, which it

was contemplated should be paid to Cochrane in the verbal arrangements carried on between Lamon and Cochrane before his death. The bill, after setting forth the facts stated in the interpleader case, averred that, on the dissolution of the firm of Black, Lamon & Co., in 1872, Lamon succeeded to the interest of Black in the remainder of the thirty per cent, after certain prior claims thereon should be paid.

The only averment of the performance of the Cochrane and Black contracts by the firm of Black, Lamon & Co., or either member of such firm, was that "they undertook the prosecution of said claim, and urged the same with great persistence before the committees of Congress, and did all in their power to bring about such legislation as the situation demanded, and they so continued so long as the firm of Black, Lamon & Co. existed. That, after some years, said Jeremiah S. Black, by reason of his failing strength and advanced life, was compelled to abandon the active work of his profession, and the said copartnership was for that reason dissolved, and the duty of prosecuting said claim devolved solely upon said Lamon."

The bill was subsequently amended in this particular by averring "that said services were rendered and said advances were made with the full knowledge and consent, and at the special instance and request of the Choctaw Nation, with the agreement and understanding that the said plaintiffs were to receive as compensation for said services such sum as the same were reasonably worth, to be paid out of the money claimed as aforesaid, when paid by the United States, and that said agreement and understanding was independent of the said Cochrane contract and of the rights claimed by the plaintiffs under and by virtue of the said Cochrane contract." A subsequent paragraph set up a lien upon the judgment rendered in favor of the Choctaws, and upon the amount due from the United States and upon the thirty per cent fund set apart by the Choctaw Nation for payment for services.

The amended bill further averred that while the question of the payment of the claim was pending before Congress, McKee procured the passage of two acts of the council of the Choctaw Nation, which acts were passed, as requested by

McKee, with the express understanding and agreement between McKee and the Choctaw Nation that he would "pay to these complainants and others such sum or sums of money as they were justly entitled to receive for the services rendered and money expended by them in the prosecution of said claim, and with the further agreement that when said McKee should receive" the money set apart by said acts, as aforesaid, "that he, the said McKee, would hold the same in his possession in trust for the benefit of such persons, including these complainants, as might be entitled to some part thereof." The prayer was that McKee be enjoined from collecting the thirty per cent set apart for the payment of expenses; that a receiver be appointed to collect the same from the Treasury and pay it out to the plaintiffs and such other persons as had a just and equitable claim thereto.

Upon filing this bill, an order was entered enjoining the defendant from receiving this money from the Treasury. McKee, however, disregarded this order, no bond having been given as required by the rule of the court, and drew from the Treasury $783,768.82, which was twenty-five per cent of the whole judgment, five per cent of the thirty per cent having been paid to one Luce, who had taken Blunt's place in the contract. A rule was issued against McKee to show cause why he should not be punished for contempt in violating the restraining order of the court, but it appearing that no bond had been filed, the motion was overruled and McKee was discharged. On the discharge of the rule, plaintiffs filed a petition based on the bill, answer, and affidavits, and prayed for the appointment of a receiver. After full argument, the court ordered that McKee should pay into court the sum of $136,500.00, to be held subject to the order of the court. McKee refused to obey this order, and absconded from the jurisdiction of the court. An appeal, however, was taken from the order, and the same was vacated and rescinded on December 3, 1889.

Subsequently, upon a hearing upon pleadings and proofs, a decree was rendered in favor of Ward H. Lamon against McKee as compensation for his services rendered and of his

disbursements and expenditures, for $35,000.00, with interest thereon at the rate of six per cent, and so much of the bill as related to the claim of Lamon and Black, or either of them, as assignees of the so-called Cochrane contract, and as surviving partners of Black and Lamon, or Black, Lamon & Co., was dismissed.

From this decree the defendants Ward H. Lamon and Chauncy F. Black appealed to this court.

*Mr. John J. Weed* and *Mr. Jefferson Chandler* for McKee.

*Mr. James Coleman* and *Mr. Nathaniel Wilson* for Lamon submitted on their brief.

*Mr. Enoch Totten* and *Mr. Reginald Fendall* for Mrs. Latrobe, submitted on their brief.

*Mr. Willis B. Smith* for Marbury, Administrator, submitted on his brief.

Mr. JUSTICE BROWN, after stating the case, delivered the opinion of the court.

In these cases, Nos. 33 and 34, we are concerned only with the decree in Lamon's favor for $35,000, and with that part of the decree dismissing the claim of Lamon and Black. The bill was originally filed for the purpose of securing the payment to Lamon and Black of thirty per cent of the sum of $2,858,798.62 which the appellant was about to receive from the United States, under the authority received by him from the Choctaw Nation, and also for an injunction restraining him from receiving such sum of money, and for the appointment of a receiver, who should be authorized to collect this sum from the Treasury, whenever the same should become due and payable; and also for an accounting between the appellant and Lamon and Black in respect to the amount due them for services rendered and money expended in the prosecution of the claim. It appearing, however, that the contract of February 13, 1855, was never carried out, nor the money ever collected as required by the contract between Cochrane and

the Choctaw Nation, before Cochrane could become entitled to his thirty per cent, complainants amended their bill, by averring that McKee procured an act of the Choctaw council of February 25, 1888, making provision for the payment of the amount due under his contract with them, by an express understanding and agreement that he would pay to the complainants and others such sum or sums of money as they were justly entitled to receive, for services rendered and money expended by them in the prosecution of their claim. In his answer, McKee denied the allegations of the bill so far as it related to services alleged to have been rendered in the prosecution of the said claim by the firm of Black, Lamon & Co., or either of them, previous or subsequent to July 16, 1870, but on the contrary averred that Black retired from and abandoned the case before such date; that by reason of such abandonment, the Choctaws, being without counsel, solicited himself and Blunt to take charge of the prosecution of such claim.

1. The first point made by the appellant McKee, that the Supreme Court of the District of Columbia was without jurisdiction to entertain the suit, because upon the averments of the bill the suit was in legal effect one against the Choctaw Nation, to which the nation was a necessary party, is without foundation. The suit is neither directly nor indirectly against the Choctaw Nation; nor if made a party defendant would the complainants be entitled to any relief against the nation. No claim is made against it, nor is any attempt made to impair the effect of its legislation. By its first contract with Cochrane, made by its agents February 13, 1855, in pursuance and by virtue of resolutions of its legislative council of November 9, 1853, and November 10, 1854, it agreed to pay Cochrane for his services thirty per cent of all collections made by him in their behalf. By its second contract, it doubtless assumed that the first contract had been abandoned by Cochrane and his successors Lamon and Black, and agreed to pay the same thirty per cent upon an amount which had already been fixed, with the further stipulation that Blunt and McKee should pay to Mrs. Cochrane five per cent upon such thirty per cent, and should adjust the claims of all parties who had theretofore

rendered service in the prosecution of such claim upon the principles of equity and justice, according to the value of the services so rendered.

The Choctaw Nation had really no interest in the thirty per cent. The stipulation was made by Blunt and McKee for the benefit of the parties interested in the percentage, and as soon as the money should be received by them, or either of them, they would hold it as trustees for the persons legally and equitably entitled to it. McKee, having obtained possession of the money, may be held accountable by a court of equity for its proper distribution. There can be no doubt of the general proposition that where money is placed in the hands of one person to be delivered to another, a trust arises in favor of the latter, which he may enforce by bill in equity, if not by action at law. The acceptance of the money with notice of its ultimate destination is sufficient to create a duty on the part of the bailee to devote it to the purposes intended by the bailor. *Taylor* v. *Benham,* 5 How. 233, 274; *Kane* v. *Bloodgood,* 7 Johns. Ch. 90, 110; *Barings* v. *Dabney,* 19 Wall. 1; *National Bank* v. *Insurance Co.,* 104 U. S. 54; *Keller* v. *Ashford,* 133 U. S. 610; *Union Life Insurance Co.* v. *Hanford,* 143 U. S. 187; *Ryan* v. *Dox,* 34 N. Y. 307; Story's Equity Jurisprudence, §§ 1041, 1255; Mechem on Agency, § 568. And in enforcing such trust, a court of equity may make such incidental orders as may be necessary for the proper protection and distribution of the fund.

It is true that in this case the names of the beneficiaries are not given in the instrument creating the trust, but they are designated by class as "all parties who have rendered service heretofore in the prosecution of said claim," and were to be rewarded "upon the principles of equity and justice, according to the value of the services so rendered." And if there be any conflict between individuals of such class, a court of equity is the proper tribunal for the adjustment of their respective claims. In such case, where the property is disposed of absolutely, the original assignor or party creating the trust need not be made a party to the bill. Story's Equity Pleadings, § 153. This proposition renders it unnecessary to consider

whether the Choctaw Nation is subject to be sued in the
Supreme Court of the District of Columbia. The fact that
the act of Congress making the appropriation required the
money to be paid "upon the requisition or requisitions" issued
by "the proper authorities of the Choctaw Nation" did not
oust the court of equity from controlling its subsequent disposi-
tion. The object of the bill is not to change the direction of
Congress in respect to such payment, but to determine the
further disposition of the money after it has reached the hands
of the designated payee.

The objection that there was no consideration for the prom-
ise made by the appellant to adjust the claims of all parties,
etc., is untenable, since the original receipt of the money is a
sufficient consideration for all promises expressed or implied
with reference to its final disposition. *Walker* v. *Rostron*, 9
M. & W. 411; Mechem on Agency, § 568.

2. The history of this controversy may be epitomized as
follows: The Choctaws, believing that they had certain just
claims against the government, and particularly for the net
proceeds of lands ceded to the United States by the treaty of
Dancing Rabbit Creek of September 22, 1830, at first employed
Albert Pike to prosecute such claims, and upon his abandoning
the same annulled his contract, employed Cochrane and agreed
to pay him thirty per cent of the amount collected by him.
The contract with him was made February 13, 1855, and con-
tinued in force until it was superseded by the contract made
with Black, November 8, 1866 — indeed, the contract of 1855
indicates that, for three years before that, Cochrane had been
acting as the agent of the Choctaw Nation in the prosecution
of certain other claims, in regard to which he had rendered
most important and valuable services, etc. During these four-
teen years he seems to have had charge of the Choctaw claims,
and been engaged in their active prosecution. During this
time the treaty of 1855, submitting the Choctaw claim for the
net proceeds to the Senate, was concluded, and the award of the
Senate of 1859 made, by which the Choctaws were allowed
the proceeds from the sale of such lands as had been sold by
the United States on the first of January preceding, deducting

certain expenses therefrom, and referring the claim to the Secretary of the Interior to state the amount due them according to certain principles of settlement laid down by the Senate. During this time, also, the act of Congress of 1861 was passed, which ratified and confirmed the Senate award, and provided for a partial payment thereof. At the same time Cochrane's express contract with the Choctaws was that his compensation of thirty per cent was only payable when the money was paid over by the United States to the Choctaw Nation or its legally authorized representatives — in other words, it was contingent upon success. Under this contract he seems to have been paid, for moneys collected before his death, the sum of $282,600, thirty per cent of the amount he had procured for the Choctaws.

On November 8, 1866, McPherson, the executor of Cochrane's estate, Cochrane in the meantime having died, acting under an authority contained in his will, assigned to Black all the interest of Cochrane in the thirty per cent compensation, and substituted him in the place of Cochrane, with the proviso that he should pay out of the money to be received by him to Cochrane's executor such sum as should be agreed upon between the parties, as well as all other demands justly due and payable out of such thirty per cent. In this connection Black seems to have been acting principally for his partner, Mr. Lamon. It appears that the firm of Black, Lamon & Co. were actively engaged in an effort to secure from Congress an appropriation to pay the Senate award during several sessions, Judge Black appearing before committees of Congress on behalf of the nation and their award, and the other parties preparing memoranda and briefs; that both Lamon and Black devoted much time in explaining the said award, and the claims upon which it was founded, to individual members of Congress. That, in 1870, Mr. Lamon, who had the principal charge of the case, advised the Choctaw delegates to discontinue further efforts to obtain from Congress the payment of the award by direct appropriation, and to apply for the passage of a bill referring the same to the Court of Claims for adjudication; that the delegates declined to accede to this proposition, and

insisted upon a further effort to secure the appropriation direct from Congress. That about this time they entered into the contract with McKee, and that thereafter Lamon, who does not seem to have been apprised of such contract, continued to urge upon Congress the justice of their claim and the duty of the United States to pay said award, until about 1878, when he prepared, at the request of Pitchlynn, the chief delegate, a bill authorizing the reference of such claim to the Court of Claims and a memorial to accompany the same.

About 1870, however, Black appears to have withdrawn from the case, except so far as was necessary for the protection of the interests of Thomas A. Scott, who had advanced some $75,000 to Cochrane's executor, whom Black felt in honor bound to protect. His reasons for so retiring are fully stated in a letter of March 27, 1883.

Whether, under Revised Statutes, § 3477, prohibiting the assignment of claims against the United States, as interpreted by this court in *Spofford* v. *Kirk*, 97 U. S. 484, and subsequent cases, the original contract between Cochrane and the Choctaw Nation, or the assignment thereof to Black by Cochrane's executor, McPherson, was of any force or validity or not, it is unnecessary to inquire. It is sufficient to say that the contract was entirely contingent upon the money being collected, and the compensation therein provided for was payable only from such money. As none was ever collected by Black or Lamon, they never obtained a legal right to compensation. But the question still arises whether, notwithstanding there was no legal claim, the Choctaws were not at liberty to recognize the fact that important services had been rendered, and that a moral obligation to pay for them existed on the part of those who should ultimately succeed in making the collection.

In this posture of affairs the contract of July 16, 1870, between the Choctaws and McKee was entered into. There is very little, if any, testimony to justify the charge in the amended bill that this contract was fraudulently obtained for the purpose of cheating the complainants and other persons interested in the claim, and to obtain possession of the funds which McKee knew were due and justly payable out of the

proceeds. The truth seems to be that the Choctaws were either discontented with the advice given by Lamon and Black to discontinue their efforts to secure a direct appropriation for the payment of the award and apply for leave to go to the Court of Claims, or became satisfied that Black and Lamon were so much engrossed in other matters that they could not bestow the proper attention upon this; in short, that Black had practically abandoned the case, and that further assistance must be obtained. That there was no intention on the part of either party to ignore what had already been done is evident from the concluding paragraph of their contract, out of which the express trust is claimed to arise, that Blunt and McKee would adjust the claims of all parties who had theretofore rendered services in the prosecution of the claim upon the principles of equity and justice, according to the value of the services so rendered. That this clause must have referred to Cochrane and his assignees is evident from the fact that the stipulation was made expressly in favor of those who had "heretofore" rendered services. As such services had been rendered only by Cochrane and his assignees, and as Cochrane's individual claim was already provided for by the donation of five per cent to his wife, it is difficult to understand for what the subsequent reservation was made if not for Black and Lamon, who had succeeded him, and who had certainly rendered some valuable services in the prosecution.

The court below was of the opinion "that the Choctaws, in defining the trust, did not mean that people whose contracts they had annulled were to come within the trust," and hence that Black and Lamon, whose services were all rendered under the Cochrane contract, were not intended to be included. We do not think this necessarily follows. It is true that, in 1874, the general council of the Choctaw Nation did pass an act annulling the contract with Cochrane, but this act is really of very little value, since the contract had already been practically abandoned as early as 1870, and was as dead as any act of the legislative council could make it. This act may have given it its *coup de grace*, but for all practical purposes it was null already. The object of the stipulation in question was to

acknowledge that valuable services had "*heretofore*" been rendered, and as Cochrane had already been provided for, it is but natural to suppose that his assignees were the ones intended to be recognized.

We are, therefore, of opinion that complainants, as surviving partners of the firm of Black, Lamon & Co., are entitled to recover the reasonable value of those services from the date of the assignment from McPherson to Black to the date of the McKee contract, which may be taken as denoting the time when the Black contract was abandoned. Whatever services Lamon rendered prior to that time he rendered as a member of, and for the benefit of, the firm of Black, Lamon & Co., and that, too, is the theory of this bill, which is founded upon a partnership claim. If, subsequently to that time, or to the time when Lamon first learned of McKee's contract, Lamon rendered services which were of value to McKee, they would not fall within the express trust of the McKee contract, but perhaps might be subject to an implied trust in his favor. As to that, however, and as to the question whether the bill is properly framed to cover an individual liability, we express no opinion.

The decree of the court below is, therefore,

*Reversed and the case remanded for further proceedings in conformity with this opinion.*