Argued October 4, 1967, affirmed April 10, petition for rehearing
denied June 19, petition for certiorari to United States
Supreme Court dismissed on stipulation
October 17, 1968

# STATE DEPARTMENT OF AGRICULTURE,
## *Respondent, v.* TILLAMOOK CHEESE
## AND DAIRY ASSOCIATION,
### *Appellant.*

439 P. 2d 592
442 P. 2d 608

*Robert M. Kerr,* Portland, argued the cause for appellant. With him on the briefs were Tooze, Powers, Kerr, Tooze & Peterson and Edwin J. Peterson, Portland.

*Harold E. Burke,* Assistant Attorney General, Salem, argued the cause for respondent. With him on the brief was Robert Y. Thornton, Attorney General, Salem.

Before PERRY, Chief Justice, and McALLISTER, SLOAN, O'CONNELL, DENECKE, HOLMAN and LUSK, Justices.

## SLOAN, J.

This is an action by the Department of Agriculture, pursuant to ORS 583.106 to obtain injunctive enforcement of its order requiring defendant to pay certain milk producers. The dispute that has existed in the Tillamook County Dairy industry for the past several years is collaterally involved in this proceeding.

Defendant is a milk producer's cooperative organized by its member milk producing patrons to receive the patrons' milk, market it and divide the net proceeds among the member patrons. The collateral party, not a party to this proceeding, but whose actions are directly involved, is the Tillamook County Creamery Association. We will refer to it as the Association. The Association is a cooperative Association whose members are producer's co-ops, like defendant.

For some years prior to the summer of 1963, defendant marketed all of its Grade A milk through the Association. In the summer of 1963, the relationship between defendant and the Association erupted in the quarrel that has been in the state and federal courts

ever since. The nature of the dispute and the persons involved does not appear in the record. It does appear that some of defendant's producers were participants or active sympathizers with one side or the other. As a result of this quarrel, defendant failed or refused to pay all of its member milk producers for milk delivered to defendant by its producers during July, August and September, 1963. Defendant did pay some of the producers. Defendant has declined to pay because, as it claims, payment was made to the producers by the Association and that the Association obtained from each producer an assignment of its claim and as a result defendant should not be forced to pay the producers. Whether or not defendant refuses to pay because it fears it may later be obliged to pay the Association for the same milk, is not clear from the issues and record presented by this appeal. It does appear that an action for accounting is now pending between defendant and the Association in which that question may be solved. The question here is: Does this situation excuse defendant from its statutory duty as a handler to pay all of its producers and is the situation a defense to the statutory duty of the department to order compliance and to the court's duty to enforce the department's order?

Defendant, as mentioned, is a handler. The duty of a handler, as spelled out by ORS Chapter 583 is, among other things, to keep adequate books and records and to promptly pay all producers from whom it buys milk.

The duty of the department and the function of the court is found in ORS Chapter 583 beginning with 583.076. That section requires the department to audit the records of all milk handlers at least once a year. If the audit reveals that the handler has not paid his

producers during the audit period, ORS 583.086 requires the department to order the handler to make payment or to show cause in an administrative proceeding within the department why such payment should not be made. If the department does not change the result of the audit as permitted by ORS 583.086, the handler may then file an appeal to the appropriate circuit court and have expeditious review of the department's findings and order. ORS 583.096.

If the handler refuses to conform to the department's order or to appeal to the court, as was the situation in this case, then ORS 583.106 provides that the department shall file "an injunctive action" in the proper circuit court to compel obedience to the department order. ORS 583.106(2) provides that in such a judicial review that the findings of the department, "if supported by substantial evidence, in the absence of fraud, are conclusive and the jurisdiction of the court shall be confined to the questions of law." ORS 583.106(3) provides that if the findings of the department include the requirement that the handlers make payment to a producer for milk, the "court shall order" the handler to make payment.

Here, the department made the statutory audit. The indisputable facts disclosed by the audit were that defendant had not paid the producers or anybody else the admitted amounts of money involved in marketing the milk involved. Accordingly, the department was obliged by the statute to enter its order of compliance and, upon failure of defendant to invoke the statutory review procedure available to it, to seek the injunctive decree of the circuit court.

Defendant is in obvious violation of the unambiguous requirements of the statute and by the equally clear mandate of the statute the court has no discretion

to do other than order compliance. *Dept. of Agriculture v. Watkins,* 1966, 244 Or 484, 419 P2d 26; *United States v. Ruzicka,* 1946, 329 US 287, 67 S Ct 207, 91 L ed 290; Jaffe, Enforcement of Administrative Orders, 1963, 76 Harv L Rev 865.

Defendant devotes much of its argument to the theory that a cooperative should be excused from full compliance with the statute. It argues that by the nature of a cooperative organization it cannot pay its producers any amount in excess of net profits and that since no net profits were shown that it could not be required to pay. ORS 583.006(5) in defining a handler specifically includes a "cooperative organization engaged in handling milk * * *." It would be necessary to delete this language from the statute and ignore the clear intent of the entire chapter if we would sustain defendant's theory.

The decree is, therefore, affirmed.

LUSK, J., concurring.

In this opinion the defendant Tillamook Cheese and Dairy Association will be referred to as the defendant and the other cooperative, Tillamook County Creamery Association, as Creamery.

The procedure pursuant to which the action was brought is, in some respects, unusual. A person or association which has been found to be in default as a result of an audit by the Department is entitled to a hearing before the Department and, if the Department adheres to the finding, to judicial review by taking an appeal to the circuit court. On such review the pertinent records of the Department are required to be transmitted to the circuit court, though additional evidence may be presented if material and there was

good reason for failure to present it at the proceeding before the Department. In this case the defendant did not seek judicial review. In such a situation and where the order has not been complied with the Department is required by the statute to file what is called an "injunction action" "based upon the findings of the department against a handler or other person whose accounts have been audited." ORS 583.106 (1) (b). In that proceeding "the findings of the department as to the facts if supported by substantial evidence, in the absence of fraud, are conclusive and the jurisdiction of the court shall be confined to questions of law." ORS 583.106 (2). It is not provided that the hearing shall be upon the record made before the Department, but it is provided that "such action shall be heard in a summary manner without a jury." ORS 583.106 (2). An appeal to the Supreme Court from the "order or decree of the circuit court" is authorized but the scope of review by this court is not prescribed. ORS 583.106 (5). The failure of the defendant to seek judicial review of the order does not, it would seem, preclude it from making whatever defense it may have to the so-called "injunction action."

It may be observed in passing that it is difficult to understand how a case like this, with its complicated issues—135 pages of testimony and 23 exhibits —can be expected to be heard "in a summary manner." The fact is, it proceeded as any other lawsuit and both the parties and the court assumed that it was to be tried as a suit in equity as, when objection to a question was sustained, the testimony was taken under the rule.

Nevertheless, in this court it appears to be conceded that if the findings of the circuit court are sus-

tained by substantial evidence they cannot be disturbed and this, I think, is the proper construction of the statute. The circuit court's only function is to determine whether the evidence before it is sufficient to sustain the Department's order and this court's review of the circuit court's decision, it would seem, was intended to be limited in the same fashion.

Substantially, two issues were raised by the defendant's answer: The first, that the producers (referred to at times in the testimony as the patrons of the defendant) had been paid by Creamery and, second, that Creamery had never paid the defendant for the milk involved and, therefore, as a legal proposition, the defendant was under no obligation to pay the producers.

On the first issue the court found that Creamery had advanced to the producers the amounts of their claims against the defendant as loans and had taken assignments of such claims as security. I think that not only substantial, but clearly preponderating evidence, supports this finding.

The only testimony relative to this question was given by Donald R. Sutton, office manager, and Beale Dixon, manager, of Creamery, both called as witnesses by the defendant. Their evidence is to the effect that Creamery had customarily made advances to producers when asked to do so by them, though it had never before experienced a situation like that it faced in September, 1963, when some of the producers had been paid by the cooperative to whom they delivered milk and the others—approximately 100 in number—had not. The decision to make the advances was taken late in September at a meeting attended by most of the unpaid producers. Under date of September 30 Cream-

ery mailed to each of them a letter reading in part as follows:

> "We understand that Tillamook Cheese & Dairy Association is holding up the check that they owe you for milk deliveries made by you to them during August. *We know that you have obligations to meet, and we are enclosing an advance check rounded out to the nearest hundred.* This is being done in accordance with the policies of Tillamook County Creamery Association to issue advances, as we know you have obligations to meet. *There will be a charge of* $\frac{1}{2}\%$ *made for this advance and if it is needed beyond the 1st of November, you will need to make arrangements for it again.*
>
> "Tillamook County Creamery Association is doing this as an accomodation [sic] to you. If you do not need this, please return it and no charge will be made." (Italics added.)

Checks were enclosed as stated in the letter. The reason for not sending the producers the precise amount owing them by the defendant was that at the time amounts to be properly deducted from their claims, such, for example, as hauling charges, had not been computed. Later, after these amounts had been ascertained, checks for the balances were remitted to the producers. Also, under date of October 14, Creamery mailed to the producers forms of assignment to Creamery of their claims against the defendant and these assignments were executed and returned to Creamery. A letter from Creamery to the producers dated October 14, 1963, reads in part:

> "Enclosed is an assignment form for your use in transferring your claim against Tillamook Cheese & Dairy Association for the milk which you shipped to them in the first 26 days of August to the Tillamook County Creamery Association for collection."

It will be noticed that the word "advances" was used by Creamery in its letter of September 30 enclosing the first checks. The word may mean payment before the proper time of payment or it may mean a loan, Black's Law Dictionary (4th ed). In this case there was uncontradicted testimony related to the milk industry that payments are not "customarily referred to as an advance." Beyond that the italicized portions of Creamery's letter of September 30, from which I have quoted, demonstrate that the sums sent to the producers were loans for a period of one month, carrying an interest charge of one-half of one per cent per month. The patrons were told that if the money was needed for a longer period further arrangements must be made. There would have been no occasion for "further arrangements" if the advances were intended as payment. Nothing to the contrary is found in the letter of October fourteenth enclosing the assignments. At least a prima facie case was thus made out supporting the plaintiff's position. To rebut this evidence, if it could be rebutted, the unpaid producers were certainly available to give material testimony, but none were called by the defendant.

I cannot agree with the view expressed in the dissenting opinion of the Chief Justice that Creamery, as a subagent, was obligated to pay the producers. No such contention is made by the defendant. The following from 3 Am Jur 2d 545, Agency § 154, I take to be a correct statement of the law:

"* * * [W]here an agent has authority to employ a subagent to receive money for the principal, the principal may treat the subagent as his agent, and, when the subagent has received the money, may recover it in an action for money had and received; * * *."

But there is no evidence that any producer has ever elected thus to treat Creamery and certainly the Department, which has brought this action pursuant to statute on behalf of the producers, has not done so. Moreover, any such attempt by producers would seem to be contrary to the legislative scheme. Defendant is a handler. Under the statute the Department is authorized to fix the minimum price for the sale of Class I milk by producers to handlers, ORS 583.505, and no handler shall purchase milk from a producer for less than the minimum price, ORS 583.525. The Department, pursuant to legislative authority, has adopted the following regulation:

Oregon Administrative Rules, Chapter 603,

"§ 06-015 [Market Pool]

\* \* \* \* \*

"(7) Payments to Producers.

"(a) On or before the 17th day of the month following the month in which milk is received, a handler shall pay to another handler from whom he has purchased milk not less than the value of milk received at the appropriate classes to which such receipts of milk have been assigned pursuant to reports as referred to in subsection (1) of this section.

"(b) First handlers shall make payment to producers on or before the 24th day of the month following the month in which milk is received for quota milk at not less than the uniform pool price per hundredweight and butterfat values as determined under subsection (5) of this section and for surplus over quota milk at not less than the minimum price established by the department pursuant to ORS 583.505."

Thus Creamery was required to pay the defendant and the defendant was required to pay the producers.

There was no relation of debtor and creditor between Creamery and the producers.

The other question, whether the defendant is absolved from paying its producers because it has not received payment from Creamery, is more difficult, but I agree with the conclusion of Mr. Justice SLOAN that this fact does not constitute a defense to the action. The two cooperatives had many business dealings with each other in addition to Creamery acting as agent in the marketing of fluid milk for the defendant. They borrowed money from each other and recently, before the commencement of this litigation, Creamery had loaned the defendant $300,000. In the course of their dealings a dispute arose which culminated in an accounting suit brought by the defendant against Creamery and which is still pending. When the proceeds of the June milk were received by Creamery, instead of remitting the money to the defendant, as had been its custom, Creamery credited the amount to the defendant on its books. The producers took sides in the controversy and the defendant borrowed money and paid its members who remained "loyal" to it. With the merits of the dispute between the two cooperatives this court now, of course, has no concern, but I think that the purpose of the Milk Audit and Stabilization Act, as it is called, is not to be frustrated by the refusal of a cooperative in these circumstances to pay its producers. That purpose is declared to be "to provide the assistance of the State of Oregon in maintaining an adequate supply of healthful milk through the state auditing of the records of handlers as they pertain to the pooling and usage of milk and the payment therefor." ORS 583.016 (1). Certainly, not the least important of the means for achieving this end is the prompt payment, in accordance with the

regulation of the Department, of the minimum price to the producers. They should not be compelled to await the outcome of extended litigation between two handlers. In such a posture of affairs the concept of a cooperative so much insisted on by the defendant—"the association is the members and the members are the association"—has no place. The statute itself then makes the cooperative a distinct and separate entity from its members.

I concur.

I am authorized to say that McALLISTER, J., and DENECKE, J., concur in this opinion.

PERRY, C. J., dissenting.

I am unable to agree with the opinion of the majority.

It should be noted that all references to ORS ch 583 pertain to the Laws of 1963 prior to their amendment in 1967. It must also be noted that ORS ch 583 is divided into two categories, (1) that of marketing dairy products and (2) the marketing and distribution of Grade A milk for human consumption. It is this latter category that must be dealt with in the matter before us.

ORS 583.006 (3) provides " 'First handler' means the handler who first receives Grade A Milk from a producer, irrespective of the ultimate destination of such milk."

ORS 583.006 (5) provides: "Handler means any person, corporation, association, or cooperative organization engaged in the handling of milk as the operator of a milk plant or as sales agent for producers." This section covers all milk products.

Under (5) (b) and (c) of ORS 583.405 (which

covers control of the production and distribution of fluid milk) a handler "[m]eans any cooperative corporation or association serving in the capacity of *a handler* or *as a marketing agent,* * * *." (Emphasis mine.)

Under these sections of the Milk Marketing, Production and Distribution Act (hereinafter referred to as the Milk Marketing Act), it is clear that any co-operative engaged in handling fluid milk that is sold or to be sold to a distributor is deemed a handler within the terms of the Act.

There can be little question but that defendant, if considered a handler under the terms of the Act, must be considered the "first handler."

The facts disclose that the defendant received the milk from its member-producers. The producers' milk was there pooled and assigned, not sold, by defendant to the Tillamook Cooperative Creamery Association (hereinafter referred to as the Creamery Association). The Creamery Association then sold the milk to various distributors—such as Carnation, Alpenrose, or Safeway. These distributors would then make payment to the Creamery Association, and the Creamery Association would remit to the defendant who would pay sums monthly to the producers.

The Creamery Association and the defendant became involved in controversy and the Creamery Association refused to remit the proceeds received by it from the sales of milk delivered during the month of August, 1963, the Creamery Association contending that the defendant was indebted to it and that the moneys it received from the sale of milk should be credited to the claimed indebtedness.

The Creamery Association then wrote each of the

producers stating in part: "enclosed is an assignment form for your use in transferring your claim against Tillamook Cheese & Dairy Association for milk which you shipped to them in the first 26 days of August." Enclosed with the letter was a form entitled "Assignment" which provided:

> "For moneys advanced and for value received, the undersigned does hereby assign, set over and transfer unto Tillamook County Creamery Association, an Oregon Corporation, all sums due and to become due from Tillamook Cheese & Dairy Association, an Oregon Corporation, * * *. It is intended that this assignment shall also include, but is not limited to, the amount due for fluid milk delivered between August 1, 1963, through August 26, 1963 * * * and all other sums due or to become due to undersigned from Tillamook Cheese & Dairy Association * * *."

The purported assignment was executed by each of the member-producers of the defendant represented by the plaintiff in this action and the Creamery Association remitted to each the amount of moneys due for the milk delivered by them to the defendant.

The trial court found that these assignments were for security purposes only and, therefore, did not constitute payment for the fluid milk.

The defendant contends these assignments were not for security purposes, but were absolute, unconditional assignments; that these assignments being unconditional constituted payment to the producers and, therefore, the trial court's judgment, resting on the finding that those producers represented by the defendant had not been paid, was erroneous.

While the ultimate question to be decided is whether under the undisputed facts the producers have been

paid, this question can only be resolved by determining the relationship of the defendant to its members and the relationship of the Creamery Association to the defendant and defendant's members.

There can be no question but that one of the primary purposes of the Milk Marketing Act is to protect the milk producer as to price and payment for his product for the purpose of supplying adequate, wholesome milk to the people of the state under the terms of the Act.

The facts of this case disclose that, although defendant might be considered a handler, the Creamery Association was acting as a sales agent of fluid milk, and under the terms of ORS 583.405 (5) (b) must also be considered a handler.

Under ORS 583.106, which provides for enforcement of the provisions of the Milk Marketing Act, no distinction is drawn as to the liability of handlers to the producer. Each handler in the line of transmission of the milk to a distributor is required to account for the proceeds from the sale.

It is well established that an agricultural cooperative is an organization of farmer-producers who own and control a business for their mutual benefit. The business is non-profit in that the profits, if any, after payment of expenses of operation, maintenance of necessary reserves, or other authorized deductions, belong to and are the property of the producers. These profits on the product marketed are allocated to the member-producers on a pro rata basis according to their participation in the pooled products. Evans and Stokdyk, The Law of Co-operative Marketing, pages 88, 91 and 111.

Therefore, unless the interests of the State re-

quire, *State ex rel v. Farmers Union Creamery,* 160 Or 205, 84 P2d 471, the status of the parties in an arrangement for cooperative marketing "is not the simple relation of vendor and vendee." *Rhodes v. Little Falls Dairy Co., Inc.,* 230 NY App Div 571, 245 NYS 432, affirmed in 256 NY 559, 177 NE 140. The cooperative acts in a fiduciary capacity for the cooperative in dealing with the members' property. *Rhodes v. Little Falls Dairy Co., Inc.,* supra; *Ark. Cotton Grs. Co-op. Assn. v. Brown,* 168 Ark 504, 270 SW 946.

Evans and Stokdyk, supra, state at p. 31:

"The association is not, in the ordinary commercial sense, a buyer of its members' products, although for technical reasons it takes title to the products to enable it to sell with good title, or to mortgage, pledge, or hypothecate for temporary financing. The association, ordinarily, acts essentially as an agent of its members in ascertaining or developing markets, and in the selling and distributing of the products. The marketing transaction is not complete until the proportion due each member from the proceeds of sales has been remitted. In the true sense, there is no 'profit' involved." See also Hulbert, Legal Phases of Cooperative Associations, pages 4 and 5.

This court recognized these principles of cooperative marketing in *Oregon Growers' Etc. Assn. v. Lentz,* 107 Or 561, 579-580, 212 P 811, when we stated:

"* * * These contracts are all similar in terms and constitute the association as the agent of the members to dispose of and market their products for the mutual benefit of the members and without profit to the association." See *Linnton Plywood v. Tax Com.,* 241 Or 1, 4, 403 P2d 708.

It, therefore, follows that, since there is ordinarily no creditor-debtor relationship existing between a member-producer and his cooperative association, a member-producer is entitled to payment only as provided in by-laws in accord with ORS 62.415. And this rule of law is applicable in this case unless a different rule is required by the Milk Marketing Act to protect the milk producer.

I, therefore, accept the premise that, if there is a conflict between the laws governing cooperatives and the Milk Marketing Act, the latter must prevail over the former.

The Milk Marketing Act, ORS ch 583, recognizes both relationships—that of debtor and creditor and of principal and agent—as to handlers for producers. ORS 583.405 (5) (a), (b) and (c). I have been unable to find anything anywhere in the Act that requires interpretation that the relationship of a member-producer to his cooperative requires changing the relationship from that of an agency to that of debtor and creditor. The only change made by the Act insofar as cooperatives are concerned is in the matter of the cooperative accounting to the member relative to allowable deductions.

All the parties agree that the Creamery Association acted as a sales agent for the defendant in the matter of the fluid milk and other milk products. Also the Creamery Association acted as bookkeeper for the defendant and paid the wages of certain employees of the defendant, and it was to be reimbursed for these expenditures. Therefore, it seems clear to me that, if both defendant and the Creamery Association are to be considered separate entities apart from their members, each was acting in the capacity of agents for

the producers, the Creamery Association acting as a subagent for the defendant.

Since the Milk Marketing Act recognizes that a handler may be an agent, and the facts disclose as to both the defendant and the Creamery Association an agency relationship to the producers, this action must be governed by the laws of principal and agent; i.e., this fact does not prevent the plaintiff from bringing an action against the defendant, but the rules of law governing the action are controlled by those governing principal and agent and not debtor and creditor.

It is a well-established principle of the law of agency that funds or property of a principal coming into the hands of an agent are held in trust by the agent for the principal. *Tagg v. Bowman,* 108 Pa 273; *Bills v. Hyde,* 49 SD 18, 205 NW 708; 3 Am Jur 2d 588, Agency § 211.

Therefore, if the plaintiff, who represents the complaining producers, is to prevail, it must be shown that the defendant as an agent has in its hands moneys rightfully belonging to the producers.

ORS 583.106 provides for enforcement by the Department of Agriculture of the payment of the moneys due a producer and specifically places the duty upon the department to proceed against the person who has not made payment for the milk. The statute provides:

"(1) The department shall file an injunction action in the circuit court for the county in which the handler or person resides or has his principal business office, based upon the findings of the department against the handler or *other person* whose records have been audited, if:

"(a) The handler or *such person* has not made payment * * *." (Emphasis mine.)

ORS 583.116 provides for a money judgment against "such handler *or person* until paid." (Emphasis mine.)

This certainly means that the party to be sued is the party who sold the milk and failed to account therefor to the producer, whether the seller is a handler or not.

While the trial court made a finding of fact that the Creamery Association had paid the defendant, the facts in the case disclose that at the time this matter was being heard there was pending, and undecided, an accounting suit between the Creamery Association and this defendant. This fact was recognized by the trial court in its conclusion of law:

> "Defendant's duty to pay for the milk delivered is in no way dependent upon receipt of funds from the resale of milk, although a finding has been entered that TCCA [Creamery Association] in fact paid TCDA [defendant] for milk."

This erroneous conclusion of law could only be arrived at upon the assumption that a creditor-debtor relationship existed between the defendant and its member-producers.

Also, the finding of fact—that the Creamery Association had paid the defendant—is unsupported by the evidence that it had credited defendant's account.

This because, although the producers assigned their milk to a marketing agency and that agency assigned it to a subagent, the subagent may not divert the moneys received for the milk (which under the act belong to the producers who are the principals in the transaction) to the payment of debts of the other agent of the producers. For it is a well-established rule of the law of agency that where an agent has authority to employ a subagent to receive money for the principal and the principal is known to the subagent, then, if

the subagent has received the money, he is liable to the principal for the money so collected. He cannot protect himself by contending he applied the moneys to the general credit of the agent, even though the agent is his debtor. *Wilson & Company v. Smith,* 44 US 762 (3 Howard 763) 11 L ed 820; 1 Mechem on Agency, 2d ed, 967, Book IV, Ch II, § 1330.

It also appears to me that, since one of the principal purposes of the Milk Marketing Act is to see that the producer is paid for his milk, then those who handle the fluid milk as agents of producers are required under their trust to pay all sums, less lawful deductions, to the producers. To hold otherwise is to permit the diversion of those moneys to an adjustment of accounts between "handlers" without the written consent of the producers and the Department of Agriculture. To permit such adjustments of accounts, permits discounting not authorized by statute and withholds the proceeds due and needed by the producers while the parties adjust their differences.

Under the facts of this case, it was the Creamery Association that wrongfully withheld the trust moneys and applied them to the purported debt of the defendant. In my opinion, these moneys belonged to the producers and, therefore, the payments made to them by the Creamery Association were in payment of moneys due them from the Creamery Association and therefore the purported assignments for security are null and void and of no effect.

For the above reasons I would reverse the judgment.

**ON PETITION FOR REHEARING**

Tooze, Powers, Kerr, Tooze & Peterson, Portland, for the petition.

Robert Y. Thornton, Attorney General, and Harold E. Burke, Assistant Attorney General, Salem, contra.

Before PERRY, Chief Justice, and McALLISTER, SLOAN, O'CONNELL, DENECKE, HOLMAN and LUSK, Justices.

LUSK, J.

Defendant has filed a petition for rehearing in which it expressly refrains from questioning, though it does not concede the correctness of, the conclusions

heretofore announced by us. Instead, it raises a new point, not included in its briefs and first mentioned by its counsel on the oral argument, and not discussed in our former opinions. The brief in support of the petition says:

"The contract between the defendant and its producer patrons provides (Ex. 16, § 10):

" '10. In addition to authorization of deduction from pool proceeds of any indebtedness owing by Producer to the Cooperative, Producer authorized (sic) deduction from pool proceeds otherwise payable to him or advances thereon, *for any indebtedness owing by Producer to Tillamook County Creamery Association* * * *.' (Emphasis added)".

The brief then quotes ORS 583.525 (3) (f), which reads:

"After the above deductions have been taken, if any, a cooperative corporation or association organized under the laws of any state and engaged in marketing or making collective sales of milk produced by its members or other producers represented by or through the cooperative, may then take and retain such other deductions from payment to its members or producers, differentials *as may be specifically authorized in advance by contract* or membership agreements between the cooperative and its members." (Italics the defendant's.)

It is, therefore, argued that, since we have held that advances made to the producers by Tillamook County Creamery Association were loans, not payment, the amount of such advances constituted deductible items under the terms of the contract and, hence, the defendant is not liable in this proceeding.

The defense is not, under the record, available to the defendant.

Exhibit 16 is a printed form purporting to have been signed by two producers and not signed by anyone on behalf of the defendant. The only evidence regarding it was given by George Milne, who was president of the board of directors of Tillamook Cheese and Dairy Association in the summer of 1963. He testified that Exhibit 16 was an "individual marketing contract between a producer and the Tillamook Cheese and Dairy Association." He further testified:

"Q Now, Mr. Milne, I'd ask you to look at exhibit number 16 again. (Handing exhibit to witness.) And I would ask you if this is representative of the marketing contracts that you had with your producers during that period of time?

"A Part of them.

"Q Would any of the producers involved in the present instance have marketing contracts of this type?

"A Some of them, yes."

There are approximately 100 producers whose claims are involved in this proceeding. There is no evidence as to how many were parties to the contract (Exhibit 16), or how much money Creamery advanced to those who were such parties; and the proof is, therefore, wholly insufficient to warrant the court in holding that paragraph 10 of Exhibit 16, even though a valid contractual provision, can be invoked as a defense to this action.

The petition for rehearing is denied.