The SECURITIES AND EXCHANGE COMMISSION, Plaintiff,

v.

The AMERICAN BOARD OF TRADE, INC., Arthur N. Economou, Phyllis H. Economou, and the American Board of Trade, Defendants.

No. 83 Civ. 6213 (SWK).

United States District Court, S.D. New York.

Feb. 2, 1987.

Arthur N. Economou, pro se.

Charles Padgett, New York City, for the Securities and Exchange Com'n.

Milton Gould, New York City, Interim Receiver.

## MEMORANDUM OPINION AND ORDER

KRAM, District Judge.

Pursuant to this Court's order of July 31, 1986 appointing Milton S. Gould, Esq. Special Master, Mr. Gould submitted his report and recommendations (the "Report") to the Court on November 5, 1986. The key finding in the Report, which is annexed (to the original) as Appendix A, is that the American Board of Trade ("ABT") has aggregate liabilities of approximately $79 million against which it holds approximately $30 million in assets. This liability, combined with ABT's inability to generate income due to the injunction on its commercial paper program, led the Special Master to recommend that ABT be dissolved and liquidated. The Court agrees that ABT should be liquidated pursuant to the recommendations set forth in the Report.

Immediately after the Special Master filed the Report, the Court authorized him to mail a summary of the Report to all commercial paper holders (the "paper holders"). This summary included instructions for obtaining copies of the Report, informed paper holders that the Court's deadline for filing objections to the Report was January 5, 1987, and advised that the Court would hold a public hearing at which individuals could comment on the Report on January 19, 1987. The Court received nearly 200 written objections, and approximately 60 persons attended the hearing.

The objections bear eloquent witness to the destruction that ABT has wrought upon the lives of thousands of investors, including individuals who have invested their life savings, elderly persons in need of their money for medical care, and couples saving for their retirement or for their childrens' education. Each expressed anguish and disbelief at facing the loss of hard-earned and carefully-saved monies. The Court is sympathetic to each of the investors and regrets that they are now bearing the brunt of ABT's unlawful activities. The Court intends to do everything in its power to ensure as full a return on each investment as possible. However, the status of defendants' business—an unlawful commercial paper operation nearly $50 million in debt—provides the Court with limited options.

The objections fall into a number of categories which the Court discusses below.

### A. THE DISSIPATION OF ABT'S ASSETS

A number of paper holders do not understand how ABT became so deeply in debt and ask for a full accounting of how its funds were used. While it is impossible, given the incomplete financial records ABT maintained, to trace each lost dollar, some conclusions are possible.

1. *The Structure and Operation of ABT*

ABT is composed of 34 related companies. Ten of these companies are operational, fourteen are capitalized but dormant, and ten are uncapitalized and dormant. These companies form what defendant Arthur N. Economou calls the ABT National Market System, which is purportedly a national exchange and market place system. In reality, the majority of the National Market System's corporations are shells which produce no income but incur expenses. The vast amount of ABT's income was derived from its commercial paper program, and this income was used to help establish and pay the expenses not merely of the commercial paper program, but of the entire National Market System as well.

2. *Shortfall in Investments*

In recent years, ABT offered commercial paper at a much greater discount than it earned on its own investments. For example, at one point ABT invested all its money in Certificates of Deposit paying an average of 6.3 percent interest, and it offered its commercial paper at a discount rate of 10 percent.

3. *Loans to Arthur and Phyllis Economou*

The Special Master reports that ABT's records reveal outstanding loans to the Economous in the amount of $521,090.00. The loans are interest free, and no terms have been discovered. The Economous claim that these loans are offset by nearly $1 million that ABT owes them in commissions. However, no documents or agreements have been found to support this claim. The Court has ordered the Special Master to investigate the Economous' liability to ABT, and the Court has frozen up to $500,000 of the Economous' assets pending a final determination of the issue. The Court has ordered the Special Master to investigate the Economous' personal assets. The Economous' sworn testimony indicates they have much less than $500,000 in assets, and all other efforts at locating other assets—including incarcerating Arthur Economou for refusal to discuss his personal assets—have been unsuccessful.

4. *Criminal and Civil Contempt of Arthur Economou*

On October 8, 1986, this Court held Arthur Economou in criminal and civil contempt because he redeemed $175,000 in commercial paper after July 18, 1986, in violation of the Court's order prohibiting him from doing so. The Court ordered Economou to repay the $175,000 to ABT. Thus far, Economou has repaid approximately $35,000 which he claims exhausts all of his assets. The Special Master is continuing his investigation of Economou's personal assets in an attempt to recoup the $140,000 balance.

5. *Other Legal Proceedings Against ABT*

In an entirely separate action from this one, the Commodities Futures Trading Commission ("CFTC") sued the ABT for commodities laws violations. In that case, the judge ordered ABT to disgorge $126,706 to make whole persons who lost money through ABT's commodity options programs, $31,074.26 to pay the trustee in the case, and $179,183 to pay the accountants. A fund in the amount of $336,936.26 was created to cover this judgment. The Special Master recommends that the trustee in the CFTC proceeding be treated as a judgment creditor, entitled to no higher priority than ABT's unsecured creditors and customers. The Court feels that the CFTC litigation raises a number of issues which still need consideration. The fund should remain intact pending resolution of those issues, and should not be distributed, at this point, with the rest of ABT's assets.

B. ALLOWING ABT TO CONTINUE OPERATIONS

Arthur Economou suggests that he be allowed to sell ABT as a going concern, which would apparently include the commercial paper business. Alternatively, he

suggests that even if the commercial paper program cannot operate, ABT should be allowed to gradually rebuild itself using its other businesses and eventually become a viable organization once again. A number of paper holders also stated that ABT has had a perfect service record for a number of years, and should be allowed to continue to operate.

■ Three problems confront any plan to rehabilitate ABT. First, ABT is enjoined from issuing commercial paper because it does not have sufficient financial records to register the paper with the SEC. In the absence of its commercial paper program, ABT has no substantial source of income. Second, ABT has generated net losses exceeding $28 million from 1980 through 1984 and incurred losses of approximately $17.5 million in 1985 and 1986. Third, ABT is indebted in the amount of nearly $50 million. With no source of income, high operating losses, and heavy debts, ABT is no longer a viable operation, and could not be sold.

Many paper holders also suggest that ABT is not insolvent, as it is not uncommon for financial institutions not to have enough assets on hand to cover all liabilities. ABT, however, does not have any significant sources of income, and thus, there is no possibility that it could meet its liabilities. The status of other institutions is irrelevant to this case.

## C. THE BEHAVIOR OF THE SEC

Many paper holders criticized the Securities and Exchange Commission (the "SEC") for allowing ABT to sell unregistered commercial paper for 14 years before attempting to enjoin the sales in 1983. They argue that since the SEC allowed ABT to issue unregistered commercial paper for so long, ABT should be allowed to continue to issue unregistered commercial paper. This would supposedly protect investors and alleviate harm and suffering.

■ The SEC's alleged delay in bringing this case does not change the law that requires commercial paper to be registered. Even if equity somehow dictated that ABT

be allowed to issue unregistered paper, the records of ABT indicate that it has been redeeming outstanding commercial paper with money it receives from new investors and rollovers. Given ABT's recent operating losses, its increasing liabilities, and its legal problems, ABT's customers would be unlikely to rollover their paper and ABT could attract few new investors. It would not be long before ABT's assets were drained and all remaining commercial paper holders were left "holding the bag". Liquidating ABT now guarantees as equitable as possible a return to *all* paper holders.

## D. PRIORITY FOR TREASURY BILL AND SPOT COMMODITY HOLDERS

As part of its business, ABT purchased Treasury Bills ("T–Bills") and commodities for its customers. T–Bills and commodities purchased through these programs represent $1,525,000 and $916,901 of ABT's assets, respectively. The Special Master concludes that T–Bill holders have a priority claim for the value of their investment, and that spot commodities holders have a priority claim for the specific and identifiable items held in their names. The Special Master recommends, however, that if the Court orders priority distribution, the order be certified for appeal pursuant to 28 U.S.C. § 1292(b). Many commercial paper holders objected to priority status for T–Bill and commodities holders. The following factual findings and legal conclusions are based on the Special Master's report and the Court adopts them.

The purchase of T–Bills by ABT is made upon the customer's remittance to ABT in New York of the appropriate funds by certified check, money order or bank draft and a signed application form. Funds so received are deposited into a checking account maintained by ABT at Marine Bank, N.A. in Milwaukee, Wisconsin. This account is used exclusively for the T–Bill program.

Both the original application form and "safekeeping receipts" sent to customers after their T–Bills are purchased state that ABT is acting as agent for their T–Bill customers and that the T–Bills are being held for safekeeping. Each T–Bill customer is assigned a separate account number.

Marine Bank, N.A. sells T–Bills to ABT's accounts pursuant to orders placed by ABT each Monday morning. Simultaneously, Marine receives reinvestment instructions from ABT for maturing T–Bills. ABT's checking account is debited in the corresponding amounts and T–Bills purchased are held by Marine in the name of "American Board of Trade, Inc., as nominee for others."

ABT sends a confirmation letter to Marine Bank stating the names and addresses of persons who own the T–Bills as well as their individual account numbers and terms of purchase.

Three weeks prior to maturity of the T–Bills, a Maturity Notice is sent by Marine to ABT, indicating the date of maturity and amount of maturing T–Bills. Notification is then sent by ABT to their T–Bill customers indicating that their T–Bill is about to mature. The T–Bill customer is given the option to receive full remittance or reinvest the value of his or her T–Bill.

Proceeds from matured T–Bills are automatically credited to the checking account of ABT by Marine. This account is used by ABT to pay customers who have chosen to redeem their matured T–Bills and to purchase new T–Bills.

■ Through the operation of its T–Bill program, ABT has established itself as either a trustee, an agent, or an agent-trustee. All three are fiduciaries with a duty to act for the benefit of another. The existence of an agency does not preclude the finding of a trust and where both are present the fiduciary is an "agent-trustee". Restatement (Second) of Agency § 14B comment a (1977).

■ Three elements are required to establish an agency. First, there must be a manifestation by the principal that the agent shall act for him. Second, the agent must accept the undertaking. Lastly, there must be an understanding between the parties that the principal is to be in control of the undertaking. Restatement (Second) of Agency § 1 comment b (1977); *Ahn v. Rooney, Pace Inc.*, 624 F.Supp. 368 (S.D.N.Y.1985). Control by the principal is essential—without it there will be no agency. *Ahn*, 624 F.Supp. at 370.[1]

■ Similar elements exist in a trust relationship. These include: (i) a settlor with legal competence to make a disposition of legal title to his property; (ii) an ascertainable trust res; (iii) a beneficiary; (iv) a present and complete disposition of the trust res; and (v) an unequivocal intention by the settlor to create a trust. *See generally*, 76 Am.Jur.2d *Trusts* § 1, *et seq.* (1975).

■ The distinction between a trustee and agent lies in the element of control and the extent of disposition of the property. A party who merely has possession of property of another and, although authorized to deal with that property, is subject to control by its owner, is an agent of the owner. A trustee, however, holds legal or equitable title to the property placed in his possession and may or may not be subject to the beneficiary's control. An agent-trustee is one who holds a title but is also subject to control by the beneficiary. Restatement (Second) Agency § 14B and comments a–c (1977).

ABT, in transacting with its T–Bill customers, appears to be acting more like a trustee than an agent. Although the original agreement addresses ABT as "agents", the use of that language is not dispositive and must be weighed in light of all the circumstances.

The main element for creation of an agency, that of control, is lacking. The

---

**1.** The application of New York law is appropriate because the transactions were carried out in ABT's New York office.

T–Bill customers maintain little, if any, control over ABT and the way it handles their accounts. There was nothing in the agreement providing for where or how ABT was to hold the T–Bills other than that the T–Bills were to be held by ABT for "safekeeping". Beyond the original agreement, the confirmation and the notice of maturity, there was no other regular correspondence between the parties over the course of three to six years. It is doubtful that the T–Bill customers were even aware of where their securities were being held.

Conversely, assuming that the T–Bill customers were legally competent, all of the elements necessary to create an express trust are present. The funds and T–Bills in the safekeeping account represent an ascertainable trust res. The T–Bill customers made a present and complete disposition of the res upon remittance of a certified check, money order, or bank draft made payable to ABT. There was an unequivocal intention by the T–Bill customers to create a trust manifested by the language on the signed agreement.

Additionally, ABT, by acknowledging that they were holding the securities for their T–Bill customers to be returned upon maturity, established the creation of an express trust. *Millbank v. Jones*, 127 N.Y. 370, 374, 28 N.E. 31 (1891).

■ It is clear that where, as here, money is delivered by one person to another to be held for a certain purpose, an express trust is created. *McKee v. Lamon*, 159 U.S. 317, 324, 16 S.Ct. 11, 14, 40 L.Ed. 165 (1895).

■ Under the rule of "trust pursuit", a trust will follow property through all changes as long as such property or its proceeds are identifiable. *Independent Coal & Coke Co. v. United States*, 274 U.S. 640, 647, 47 S.Ct. 714, 717, 71 L.Ed. 1270 (1927). *See generally*, 76 Am.Jur.2d *Trusts* §§ 251–258 (1975). It is unnecessary to conclude that a trust relationship was originally established for this rule to apply because funds or property coming into the hands of an agent are also held in trust by the agent for the principal. *State Dept. of Agriculture v. Tillamook Cheese and Dairy Association*, 251 Ore. 393, 439 P.2d 592 (1968). Thus,

> "[W]here money or property is entrusted to [an] agent for a particular purpose, it is impressed by law with a trust in favor of the principal until it has been devoted to such purpose; and if it is wrongfully diverted by the agent, such trust follows the fund or property ... so long as it can be identified ..."

*Air Traffic Conference v. Downtown Travel Center, Inc.*, 87 Misc.2d 151, 154, 383 N.Y.S.2d 805, 806–807 (N.Y.Sup.Ct.N. Y.Co.1976). Even if the fund is placed in the trustee's general account, the trustee does not become a mere debtor of the settlor. *Id.* 383 N.Y.S. at 806. The same is true of an agent who deposits funds of his principal in an account in the agent's name—the funds remain that of the principal and are not subject to claims of the agent's creditors. *Kinnison v. Guaranty Liquidating Corp.*, 18 Cal.2d 256, 115 P.2d 450 (1941).

■ Additionally, New York E.P.T.L. § 11–1.9 gives fiduciaries express (although somewhat limited) authority to commingle securities from different trusts, recognizing that the merged securities do not lose their identity as individual trust res. *See also In re Will of Coe*, 80 Misc.2d 374, 363 N.Y.S.2d 265 (N.Y.Surr.Ct.Nassau Co.1975).

■ By placing the T–Bills in a safekeeping account which it held as "nominee for others", ABT did not destroy the trustee/settlor relationship it had with its customers. Likewise, the T–Bills remained intact as the identifiable trust res, so that the trust "followed" the funds and the T–Bills into the safekeeping account.

ABT's T–Bill customers maintain their priority status over general unsecured creditors of ABT, despite the appointment of a receiver.

The purpose of a receivership is to place the property in litigation under control of the court so that it may be maintained and held for distribution pending final adjudica-

tion of the rights of the parties. 66 Am. Jur.2d *Receivers* § 248 (1975). Generally, it is the duty of a receiver to preserve existing priorities among the claims, interests, and liens for such distribution. *Id.* 363 N.Y.S.2d at 251. A receiver should not pay or discharge any corporate obligations except as he is directed by the court. *Woodruff v. Erie R. Co.*, 93 N.Y. 609 (1883). *See generally,* 4 White, *White on New York Corporations,* ¶¶ 1201–1218, (13th ed. 1985).

 It is recognized, both in case law and by statute, that a trust priority survives the appointment of a receiver to the trustee/company. *See e.g.,* N.Y.Bus. Corp.L. § 1210 (McKinney 1986) and *Van Dyck v. McQuade*, 86 N.Y. 38 (1881).

For example, where a bank declared a dividend for its shareholders, the court, in an action brought on by the bank's receiver, held that from the moment it is declared, the dividend is trust property of the shareholder. *Van Dyck v. McQuade*, 86 N.Y. 38 (1881).

> "[A]lthough the company was insolvent … money appropriated and set apart for distribution among the stockholders by way of dividend became a trust in the hands of the corporation, to which the stockholders as individuals had acquired vested rights, and they consequently were entitled to the fund in preference to the creditors of the corporation."

*Id.* at 52.

Likewise, in a receivership governed by Article 12 of the New York Business Corporations Law, debts owing by the corporation as trustee are paid well ahead of general creditors of the corporation. N.Y.Bus. Corp.Law § 1210 (McKinney 1986).

 As to its commodities business, ABT sold commodities contracts to its customers and arranged for the safekeeping of customers' commodities at various repositories around the country. Applying the same analysis to the commodities program, the commodities customers also appear to be entitled to priority distribution.

Based on the above, the Court orders that the T–Bill holders and commodities holders with identifiable property be given priority status in the distribution of ABT's assets. The Court, however, certifies this order for interlocutory appeal pursuant to 28 U.S.C. § 1292(b). The issue of priority is purely legal as there is no dispute as to the underlying facts. While the authorities the Court has relied on are still good law, they are generally old, and may not reflect current equitable notions. Certification will also materially advance the determination of this litigation. If an interlocutory appeal were not granted and ABT were liquidated in accord with this order, commercial paper holders would effectively be barred from challenging the priority distribution, as the money would already be distributed.

### E. RESERVE ACCOUNTS AND FORWARD COMMODITIES PROGRAM

 A number of individuals informed the Court that they hold cash in general reserve accounts and reserve accounts affiliated with ABT's spot and forward markets and supervised basket programs. They request priority status in the distribution of this money. The Special Master's analysis of ABT's handling of the funds revealed that all of these monies were deposited into ABT's general accounts and were used by ABT in the ordinary course of its business. There was no segregation of funds which was held "in reserve" nor do the application forms create any basis for establishing a trust relationship. These obligations would constitute general unsecured obligations of ABT and, therefore, should not be given any special treatment. The Court thus orders that these cash participants be treated as such. Since this order is based on a legal issue, and the same equitable considerations as with the priority distribution apply, the Court certifies this portion of its order to the Court of Appeals along with its order pertaining to Treasury Bill and spot commodities distribution.

## F. FUND FOR ADMINISTRATIVE EXPENSES AND THE SPECIAL MASTER'S RATE OF PAY

 Many paper holders objected to the Master's recommendation that $1 million be set aside for administrative expenses in the belief that it is earmarked for payment to the Master. The purpose of the fund is to ensure that money is available to pay personnel to distribute ABT's assets. Any funds left in the fund will be distributed to noteholders. This fund will allow an orderly distribution of funds and the Court approves it. As to the Special Master's rate, $200 per hour is significantly below his usual rate, and the Court believes it is reasonable.

## G. PRIORITY STATUS TO SPECIAL INTEREST GROUPS

 Many paper holders requested that priority status be given to various special interest groups, such as senior citizens, minors, church and charitable groups, and pension funds. Each of these requests demonstrated the grave destruction sown by the American Board of Trade's operations. Nevertheless, there is no legal authority justifying the priority treatment of those groups.

## H. OUTSTANDING PURCHASE ORDERS

 A number of individuals indicated that they ordered commercial paper in July 1986, sent ABT checks which ABT cashed, and never received their commercial paper. The Special Master recommends that these claims be dealt with on an individualized basis, and the Court agrees. The appropriate time to deal with the issues raised by these individuals is as individual claims are received.

The Court has considered all the other objections to the Special Master's Report and finds them to be without merit. The Court thus adopts the Special Master's recommendations in full, except as they relate to the payment of the CFTC claims, which the Court requests the Special Master to investigate further. The Court orders that the Special Master is reappointed as Receiver of the ABT entities with the powers and responsibilities described in the Court's orders of September 2, 1986 and September 26, 1986. The Receiver shall notify all customers and creditors of ABT that they must file a statement of their claim with the Court by April 1, 1987.

SO ORDERED.